**Billy L. WILLIAMS, Plaintiff,**

v.

**Paul GOLDSMITH, Jr., et al., Defendants.**

No. Civ.A. 95–A–238–S.

United States District Court, M.D. Alabama, Southern Division.

April 29, 1998.

D. Bruce McLean, Enterprise, AL, Wesley Romine, Montgomery, AL, for Plaintiff.

Bart G. Harmon, Daryl L. Masters, Montgomery, AL, for Defendant.

Brian D. Wilson, Ft. Polk, LA, pro se.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

This matter is before the court for summary judgment consideration. Defendant former Sheriff Brice Paul filed a motion for summary judgment on February 20, 1998, requesting summary judgment in his favor as to all counts. Defendant former Deputy Paul Goldsmith, Jr., filed a motion for partial summary judgment on the same day, incorporating some of the arguments of Paul. For the reasons stated below, these motions are due to be GRANTED.

## I. INTRODUCTION & PROCEDURAL POSTURE.

This case was filed on February 21, 1995, by plaintiff Billy L. Williams. His complaint alleges that the following defendants unlawfully seized his automobile: (1) Paul Goldsmith, Jr., a former officer of the Coffee County Sheriff's Department, sued in his individual capacity for damages, as well as in his official capacity for prospective injunctive relief; (2) Brice R. Paul, former Sheriff of Coffee County, Alabama, sued in his individual capacity for damages, as well as in his official capacity for prospective injunctive relief; (3) Ben A. Moates, present Sheriff of Coffee County, Alabama, sued in his official capacity for prospective injunctive relief; (4) Brian David Wilson, a member of the military; (5) the Coffee County Sheriff's Department; and (6) other fictional defendants.

The complaint contained eight counts. Count I sought damages and injunctive relief against the defendants pursuant to 42 U.S.C. § 1983 for alleged constitutional violations.

The remaining counts asserted various state law causes of action against all defendants except defendant Moates (conversion, trespass to property, negligence, wantonness / recklessness, negligent supervision, and theft). As determined in footnote 1 of the court's earlier dismissal order, the state claims seek only money damages, not injunctive relief. See Williams v. Goldsmith, 905 F.Supp. 996, 998 n. 1 (M.D.Ala.1995).

The earlier published opinion in this case addressed a Fed.R.Civ.P. 12(b)(6) motion to dismiss filed on April 14, 1995, by defendants Goldsmith, Paul, Moates and the Coffee County Sheriff's Department. The court ruled on this motion, dismissing the Coffee County Sheriff's Department because it was not an entity subject to suit, see Dean v. Barber, 951 F.2d 1210, 1214–15 (11th Cir. 1992); Fed.R.Civ.P. 17(b); White v. Birchfield, 582 So.2d 1085, 1087 (Ala.1991), as well as dismissing a few theories of recovery. The court ruled in favor of the Plaintiffs on some other issues, however, (1) allowing a § 1983 claim for deprivation of Fourth Amendment rights to go forward against Paul, Goldsmith, and Moates; and (2) allowing the state claims-except for negligent supervision-to go forward against Paul and Goldsmith. See Williams, 905 F.Supp. 996.

Former Sheriff Paul, former Deputy Goldsmith, and present Sheriff Moates are now the only defendants remaining for the court's consideration. After a status conference on November 3, 1997, the court severed the claims against Brian D. Wilson because of his temporary immunity as an active member of the United States Armed Forces. See Order Nov. 3, 1997.

In the present motion, former Sheriff Paul has moved for summary judgment on the grounds of (1) Eleventh Amendment immunity as to the federal official capacity claim; (2) lack of evidence regarding his causal connection, or participation in the acts alleged; (3) qualified immunity; and (4) state sovereign immunity as to the state law claims. Deputy Goldsmith has joined in the arguments regarding Eleventh Amendment immunity and state law sovereign immunity. As noted, these arguments are due to be granted.

## II. *SUMMARY JUDGMENT STANDARD.*

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548.

If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); *see also* Fed.R.Civ.P. 56(e). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Peppers v. Coates,* 887 F.2d 1493 (11th Cir.1989).

## III. *FACTS.*

In deciding a motion for summary judgment, the evidence presented by the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The court has done so in making all decisions. The court has chosen, however, to relate more than just the evidence relied upon by Plaintiff in the "Facts" section. This is done to more clearly define the issues that remain.

This case centers around a dispute between a former son-in-law and a former father-in-law over possession of an automobile that was owned by the son-in-law, during his marriage to the daughter. The son-in-law claims that the car was due to be returned to him because the ex-wife did not make payments as required by a separation agreement. He regained possession of the car on Sunday, February 6, 1994, while a Sheriff's deputy was present. The facts are uncontested that the deputy had no court order or other official document which gave him rights to effect the seizure. Nevertheless, the Plaintiff, father-in-law to the ex-husband, asserts that the deputy forced him to turn the car over to the ex-husband. The deputy insists that he merely was present at the time to prevent a breach of the peace.

The present suit is not one by the father-in-law to regain possession of the car. Indeed, the evidence before the court never mentions what eventually happened to the car. Instead, this suit is one by the father-in-law against the Sheriff and Deputy because of the role that they allegedly played in taking the car.

### The Separation Agreement and Title Exchange.

Some knowledge of the history of the transaction between the father-in-law and the son-in-law is important to understanding the full tale that must be told. Brian D. Wilson—the soldier severed from this suit because of temporary military immunity—is the son-in-law. On October 21, 1992, he purchased an older model Nissan Pulsar from an Enterprise car dealership. Brian eventually was issued a title in his name on December 16, 1992.

Eight days after Brian was issued a title, on Christmas eve, 1992, this Pulsar became part—at least on paper—of a separation agreement between Brian Wilson and his wife, Laura Lynn Wilson. According to the purported agreement, the car was to become the "sole and separate property" of the wife after the divorce, subject to her agreement that she continue to make payments and maintain the insurance. As stated by the agreement, if Laura should "fail to make any or all of the payments as required," the

automobile was to "be delivered to" Brian to "be his property." The agreement was signed by both of the spouses, Brian and Laura, and was witnessed twice by Laura's mother, Teresa G. Williams.[1] The separation agreement was put on hold for some time, when Brian and Laura decided temporarily that they were not going to divorce. *L. Phillips Depo. 30:6–19.* Nevertheless, the separation agreement was eventually incorporated into a Final Judgment of Divorce between Brian Wilson and Laura Wilson on February 19, 1993. *See Final Judgment of Divorce, Wilson v. Wilson, no. DR 93–091 (Ala.Cir.Ct., Dale Co., 2/19/93).*

Apparently, some sort of transaction other than that referenced in the separation agreement took place with this car prior to the divorce, however. On the same day that the separation agreement was allegedly entered—back in December, two months prior to the divorce decree—the title to the car reflects that it was transferred from Brian to his father-in-law, Billy L. Williams. Brian Wilson apparently signed the "assignment of title by registered owner" on the back of the title. Billy subsequently had a new title issued in his name, reflecting the transfer on Christmas eve.

The financial particulars of this Brian–Billy deal were apparently that an older Chevette belonging to Billy would be traded for the Pulsar, with Billy agreeing to pay 10 payments owed by Brian to the credit union. *B. Wms. Depo. 31:11–22.* Each of the payments to the credit union was for approximately $118.30. *T. Wms. Depo. 19:13–16.* Receipts produced at Teresa Williams' deposition reflect that 11 payments were made. *Id. at 29:10 – 30:10.* Billy says that he paid

thirteen of these payments, after Brian made harassing phone calls to him. *Id. at 32:1–2; 46:9 – 47:15.*[2]

Plaintiff has admitted that *a* separation agreement was incorporated with the divorce decree. Nevertheless, Plaintiff insists that the Pulsar was conveyed before the decree was entered. *See Plaintiff's Response to Defendants First Request for Admissions.* Plaintiff has further denied that Laura ever entered an agreement to make payments on the Pulsar. *Id.*

Suffice it to say, after whatever deal took place: Billy, the father-in-law, ended up with the Pulsar; and Laura, the ex-wife, ended up with the Chevette; and Brian, the son-in-law, apparently ended up mad. The court is not in possession of any testimony from Brian, since he is in the military and could not be compelled to stand trial now. Apparently, his deposition was never taken. Nevertheless, it is apparent from testimony regarding Brian's actions on February 6, 1994, that he believed, or at least acted like he believed, that something wrong was done to him. Brian must have either thought that Laura did not live up to the separation agreement, or Billy did not live up to his agreement. Either way, on Sunday, February 6, 1994, Brian—now apparently carless—bummed a ride from a Georgia friend. The friend brought Brian to Enterprise, where Brian was to claim that the Pulsar should be his.

### Sunday, February 6, 1994.

The Plaintiff's version of this day's events paints a picture of a Deputy violating his legal rights in a dispute between two private parties (the ex-father-in-law Billy and the ex-son-in-law Brian). As recounted by the Plaintiff and his family:

> Enterprise Toyota from a credit union on October 20, 1992, in the amount of $3500. The papers apparently reflect an advance on a line of credit, however. They definitely do not evidence a loan with a car being taken as collateral. Nevertheless, Plaintiff answered an interrogatory by stating that he "told Brian Wilson that I would pay the money directly to the Army Aviation Center Federal Credit Union where he had obtained an unsecured promissory note loan from which proceeds he told me he used to pay cash for the automobile." *Plaintiff's Response to Defendant's First Set of Int.*

---

1. The court does not mean any disrespect to any of the parties or individuals, but will refer to the various people by their first names. This is done because of the overlapping last names in the families and because of the shifting last names in divorces. The ex-wife in this situation, Laura Lynn, has been married five times, two subsequent to Brian Wilson. *B. Wms. Depo. 23:2–22.*

2. As if the particulars of this car swap need to be more complicated, neither title, in apparent conflict with the separation agreement and the Brian–Billy agreement, reflects that there is a lien on the car. Papers from Brian have been presented which do show a check being issued to

After Billy apparently had made 13 payments for the car (more than the required number under their agreement), Brian showed up at his house one Sunday morning, along with a Sheriff's Deputy, demanding the car. *B. Wms. Depo. 57:16–64:3.*[3] Billy, his wife Teresa, their son B.J., and Laura were all at home that morning. *B. Wms. Depo. 74:8–12.*[4] Mr. Williams' wife called him to the door. *Id. at 63:12–14.* Brian was there demanding the car, and Officer Goldsmith was there as well, both on the porch. *Id. at 63:22 – 64:14.*

After Billy initially refused to give up the car to Brian, Officer Goldsmith, in uniform and in a county car, allegedly told Billy, in a stern voice, that Brian "had the paperwork to pick up some ... property in some divorce papers," namely the Pulsar. *Id. at 75:23 – 76:4; 82:1–9.* Billy offered to show the officer his title to the car four or five times, but the officer told him "that they had all the paperwork they needed." *Id. at 82:10–17; 86:16–23.* Officer Goldsmith was not holding any papers when he made this statement. *Id. at 82:10–17.* Billy could not see the papers that Brian was holding at that time, and he had never read the divorce decree before that day. *B. Wms. Depo. 84:4 – 86:6.*

Eventually everyone began walking toward the car, with Billy continuing to protest the 'repossession' because of his title. *B. Wms. Depo. 87:19 – 89:20.* Billy asked the deputy on more than one occasion if he had a choice in the matter, and the deputy, growing more rude, told him that he did not. *B. Wms. Depo. 87:1 – 89:20.* Billy believed that if he had not surrendered the car, he would have been arrested. *Id. at 94:2–8.* Billy eventually asked if he could at least get his belongings from the car. *90:7–15.* The officer allowed him; Billy spent about 20 minutes doing this; and then Billy left the keys in the ignition. *B. Wms. Depo. 90:7 – 91:8.* At

some point, Brian demanded the title to the car and the officer said that Billy would have to give it to him, but Billy refused. *Id. at 90:17 – 91:5.* The title is still in Billy's possession. After Brian left in the car, Billy had to tell the officer, twice, to get off his property, before the officer would leave. *B. Wms. Depo. 93:12–21.*

Laura—the daughter of Billy and the ex-wife of Brian—could see some of the events unfolding from the back yard where she was washing the 1984 Chevette that she acquired in the swap. *B. Wms. Depo. at 96:4 – 97:8.* She saw her father clean out the Pulsar, and turn over the key. She also heard Officer Goldsmith tell her father, that "he had all the paperwork he needed and he didn't have a choice but to give the man the car." *L.Phillips Depo. 62:13 – 65:10.*

Mrs. Teresa Williams—wife to Billy, mother to Laura—also was there. She overheard the deputy say that Billy "had to give him the keys to the car and all." *T. Wms. Depo. 37:11–21.* Teresa was away from the scene while she went to call the Sheriff's department to get the Sheriff to intervene in the goings-on. *T. Wms. Depo. 39:15–22.* She spoke to the dispatcher who told her the Sheriff would call her back, but the Sheriff never called. *Id. at 40:15 – 41:10.* She heard him ask the deputy over the scanner whether everything was ok; the deputy responded "10–4." *Id. at 42:21 – 43:6.*

B.J. Williams—the son of Billy and Teresa who was about 10 years old at the time—also overheard and observed many of the events. He also largely corroborates Billy's version of the events: "the deputy said that he had enough papers and he didn't need to see no title." *B.J. Wms. Depo. 12:17–18.* B.J. even testifies that his father asked the deputy "four or five times" to look at the title, although B.J. says this all happened on the

---

3. Brian had earlier asked Laura to meet him in Eufaula or Columbus in the car just to see her. She refused. *L.Phillips Depo. 55:5–18.* Apparently the Camaro that Brian was driving was giving him problems. *Id. at 56:18 – 57:4.* Laura suspects that this was just a ruse to get the Pulsar from her.

4. The exact time that Brian showed up is somewhat confused in the testimony. B.J. places it

after he got back from going to church with his cousins, after 12. *B.J. Wms. Depo. 7:16 – 19:8.* His mother placed it before church around 10:30 or 11. *T. Wms. Depo. 51:20 – 52:7.* Much of the guesses about the timing of the event were based on whether the people who rode by to observe the event were on their way to church, or on their way back from church.

porch, contradicting his father's version. *Id. at 13:1–13.* B.J. never heard the deputy say that he was only ther ì to protect the peace. *Id. at 20:7–18.*

A companion was also there along with Brian Wilson, but no evidence of his involvement has been offered. Mr. Kelly—grandfather to Teresa—from across the street also talked to the officer. *B. Wms. Depo. 100:16 – 101:6.* His testimony has not been presented, however, as he is apparently quite elderly.

***Scanner.***

Teresa Williams, the wife of the Plaintiff, was listening to a police scanner throughout the events, and has offered testimony of what she heard. She apparently listens to the scanner on numerous occasions for entertainment. She had heard the dispatch and was listening to the reports before she even knew where Deputy Goldsmith was headed or what property he was after. Her report is included in an affidavit submitted to the court. There are a number of problems with this evidence: Teresa's affidavit does not explain how she could identify the various officers talking on the scanner;[5] it does not explain how the conversations of non-parties are not hearsay; nor does the affidavit explain how it makes some of the logical leaps that it makes interpreting some of these statements. Defendants have not objected to its admissibility, however, so the court will not question the affidavit on the basis of Teresa's ability to understand police codes or whether the hearsay is admissible. Nevertheless, the court will refuse to consider some of the statements contained in the affidavit, which are nothing more than supposition. *See* Fed. R.Civ.P. 56(e) ("affidavits shall be made on

personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . .).

Teresa's relation of the events begin with a dispatcher sending Goldsmith to help retrieve property. Goldsmith reported over the scanner that he did not know where he was going, rather "he was just following the man's car to the place where the car was." Teresa relates that next Sgt. Killingsworth radioed to tell Goldsmith "he had better have the right paperwork before he went messing with that car," and that Goldsmith replied "that's a 10–4." Teresa interprets these statements to mean that Killingsworth was telling Goldsmith "not to get the car unless he had the right paperwork," and that Goldsmith was replying to say he "had the correct paperwork." Her interpretations are groundless given the statements and her affidavit. There is simply no basis for her to read the statements as instructions by Killingsworth to seize the car, or as a statement by Goldsmith that he intended to take the car.

Teresa reports a further event after she called the Sheriff's office to get Brice Paul to intervene on their behalf. She heard Sheriff Paul ask Goldsmith if he needed any help. Goldsmith replied that everything was under control. No one from the Sheriff's office called Mrs. Williams or her husband.

***Deputy Paul Goldsmith, Jr.***

Deputy Paul Goldsmith, Jr. also testified at deposition. Much of his testimony regarding the facts of February 6 serves just to directly contradict the facts as related by the Williams family.[6] That is, of course, why he

---

5. In her deposition, Ms. Williams testified that she knew their voices from listening to the scanner on numerous occasions; and that she also knew their code numbers: 1901 for Sheriff Paul; 1910 for Deputy Goldsmith. *T. Wms. Depo. 34:5 – 11.*

6. He stated that he was familiar with the requirements of the Constitution, and knew that he could not participate in the seizure of property without an order from a judge. *Goldsmith Depo. 19:20 – 22:6.* As stated in Goldsmith's own words:

A lot of [what Billy Williams testified to] is true. What is not is—He did ask me to see the—if I would look at the title of the vehicle, and I stated, no, I don't need to see the title of the vehicle; I don't need to see any paperwork from either subject; I am here to keep the peace and only to keep the peace. He asked me that twice. That was the only two times I left my vehicle was to explain to him that I was there to keep the peace and only to keep the peace. . . .

He did not tell me to get off his property. . . . [Billy Williams] said yesterday I told him I'd put him in jail if he did not relinquish the

personally did not move for summary judgment as to all claims. The dispute between his testimony and that of the Williams establishes that a jury will be required to pick between the two.

Putting aside the factual dispute of what Mr. Goldsmith may have said to the Williams, however, there is still much testimony from the deputy—uncontested testimony—which concerns events about which the Williams had no personal knowledge, and offered no evidence. For example, Goldsmith stated that he was initially alerted to the events when he was called over the radio to meet someone at the Enterprise Police Department. *Id. at 28:23 – 29:6.* Officer Goldsmith met Mr. Wilson there—whom he did not know before—reviewed his divorce decree, and told Wilson that it gave him no right to participate in taking the vehicle. *Id. at 32:15–33:7.* Mr. Wilson then asked Deputy Goldsmith if he would accompany him to the house to see if Billy would give him the car—because Wilson had travelled all the way from Georgia and could not wait around until the next day to see a Judge. *Id. at 34:12–21.* It is the testimony by Goldsmith of what happened next that established former Sheriff Paul's role in these events.

Goldsmith testified that it was the policy of the Sheriff's department at that time that deputies could not accompany individuals to places of disputes without the permission of a "supervisor, the sheriff, or a judge's order." *Id. at 34:22 – 35:18.* Because of this policy, Goldsmith-the only deputy on patrol that morning-paged the Sheriff regarding Wilson's request. The Sheriff called Goldsmith back on the Enterprise PD telephone. *Id. at 35:22 – 36:17.* The Sheriff confirmed to Goldsmith that the deputy had no authority to help Wilson; in fact Wilson apparently

had no authority to take the car. *Id. at 37:2 – 16.* Goldsmith relayed that Brian was concerned about Billy, however. Brian had told Goldsmith that it was a messy divorce. *Id. at 55:6–11.*[7] Acting on this information, the Sheriff told Goldsmith over the phone to "accompany [Brian], keep the peace; if you don't you'll probably be out there in thirty minutes." *Id. at 37:2 – 38:22.*

The only further contact between the Sheriff and Goldsmith was later when the Sheriff radioed to ask if everything was okay, and Goldsmith said it was. Goldsmith does not know if Teresa's call precipitated this; he assumed it was a routine call to check on a deputy. *Id. at 44:1 – 45:14.* Goldsmith did hang around briefly after Wilson left—only because an old man across the street had started a conversation with him about non-law-enforcement matters. *Id. at 61:6–13.*

### *Former Sheriff Brice Paul.*

Former Sheriff Paul testified about two separate subjects: his own personal actions in this event, and the role of his office policy in this event. This evidence, like the evidence from Goldsmith regarding his initial contacts with Wilson and his contacts with his superiors, is largely uncontested.

As to his personal role in the events, Sheriff Paul's testimony largely mirrors that of Deputy Goldsmith. He was paged to call the deputy while at church. *Id. at 11:17 – 12:20.* Sheriff Paul agreed with Goldsmith that the divorce decree gave the Sheriff's office no power. *Id. at 12:21 – 13:21.* Sheriff Paul told Goldsmith that

> we'll do it like we usually do it. If you go out there with these people and you go and you stand by and if they want to talk and they can work their problems out, [in some] shape, form or fashion, then that's

---

vehicle. I never said anything like that. I didn't have anything there—I was not there to make anybody relinquish anything or tell anybody to do anything with any property. I did not say that to him ...
I was not on the porch....
I was probably ten foot away from the steps, from the front porch....
I said, no, you don't have to give him anything....
[Williams] looked at me and said, do you mind if I get any belongings out of this vehicle. I said, I don't—I'm here to keep the peace. You

> can take whatever you want. I'm not here for that.
*Goldsmith Depo. 24:9–27:9; 40:1–2; 42:14–18.*

7. There is no evidence establishing that Billy or other members of the Williams family would necessarily be dangerous or violent. Billy had only been locked up once for a fight with his brother-in-law back in 1981. Teresa had also been locked up on one occasion, but that was for bad checks.

fine, but don't let the situation get out of hand. If they get to arguing and fussing, you'll have to tell—tell that fellow that y'all got to go; get in the car, and you leave....

[Deputy Goldsmith] said, fine, and we ended the conversation.

*Id.*

Paul's only other personal action was to call the deputy when he got out of church just to see if Goldsmith needed any assistance. *Id. at 20:1–9.* Paul has no independent recollection of being asked to call Teresa Williams, but he states that it would have been his normal response not to return that call since there was a deputy on the scene. *Id. at 22:5 – 24:5.* A deputy "was out there, and he could handle it." *Id.*

As to the role of policy, Sheriff Paul stated that he—the Sheriff—made policy for the department. *Paul Depo. 6:22 – 7:2.* Some of these policies covered the appointment and supervision of deputies. *Id. at 9:10–15.* Paul described the role that he instructed Deputy Goldsmith to play in the events as "like we usually do it": let the parties try to work out their problems, intervene if the parties get angry, then tell the visitor that he has to leave. *Id. at 13:2 – 14.* Sheriff Paul also testified that deputies are taught and informed of the policy

> that the only authority they had on the civil side of the law was that that the court gave them, and the majority of that came through some form of order, whether it be an order from the judge or a standardized execution form that the judge signed ...

*Paul Depo. 14:3 – 16:23.* Sheriff Paul stated that deputies received a lot of on the job training with civil matters because

> when you get on the civil side of the law, a lot of times it takes a lot of discretion. It takes a lot of ability to reason with people and try to handle things as easy as they will let you handle them.

**8.** 1910 was the designation for Deputy Goldsmith. *S. Lopez Depo. 18:10–12; R. Scheipe Depo. 9:21–22.*

**9.** The code 10–8 "[m]eans he's freed up from whatever was going on before. He's able to take another call." *S. Lopez Depo. 14:11–13.*

*Id.* He also states that it was the custom and practice of the Sheriff's department to do an investigation when a complaint is received. *Id. at 30:6–16.*

Sheriff Paul does not recall a lawsuit against his office during his 15 years as Sheriff where the allegations were based on "taking of property or assisting in the taking of property unlawfully or wrongfully." *Id. at 5:11 – 6:1; 38:23 – 39:5.*

### The Dispatcher's Log.

The Plaintiff does attempt to contest some of the recollections of the interactions between the Sheriff and Deputy Goldsmith by offering evidence of the dispatch logs from that day. Two dispatchers gave depositions about the events in question. Stanley Lopez had no independent recollection of the events, and merely reviewed the log for the attorneys. *S. Lopez Depo. 8:2–23; 23:20–22.* Ruth Scheipe also testified at deposition. She had almost no recollection of the events other than the log. *R.Scheipe Depo. 12:16–22.* Her deposition is similar to Lopez's, simply interpreting and identifying the dispatcher's log from that day.

Pages from the dispatcher's log of the Coffee County Sheriff's Department have been furnished to the court. These reflect the following relevant entries:

10:25 ... 1910 [8] 10–8 [9] In route to Enterprise Police department In route to talk to subject about divorce situation ...

10:40 ... 1910 dispatched by Keith to escort someone from Ent. PD to College St Ext. to pick up property / divorce has papers) ...

10:48 ... out on Co. Rd 620 with Brian Wilson all 10–4 ...

11:05 ... px from Theresa Williams—wants 1901 [10] to straighten out question about car—1901 advised only if 1910 needs him—1910 advised there was no problem

**10.** 1901 was the designation for Sheriff Brice Paul. *S. Lopez Depo. 16:13–19.*

1

None of these entries reflect or suggest instructions from the Sheriff for the deputy to assist in the seizure of the car. Neither do the entries reflect anything that the parties told the Sheriff, or anything that the Sheriff told the parties. All the logs can reflect are that (1) the deputy did "escort" Brian Wilson to the Williams; (2) the deputy thought there was no problem; and (3) the Sheriff did indeed refuse to call the Williams back, although he did respond to their call.

### Litigation.

Billy Williams never filed a suit to recover the car. *B. Wms. Depo. 112:21 – 113:1.* Instead, on May 9, 1994, Billy Williams served a "verified claim against Coffee County, Alabama" by process server to the Chairman of the County Commission.[11] It alleges that the deputy "made Claimant surrender possession of the Nissan to Wilson." It states, further, that Goldsmith "told Claimant that he has no choice but to surrender possession of the car over to him so he could turn it over to Wilson." Claimant demanded $100,000. The county apparently never responded to this complaint, probably because it was not liable, or could contest that it was not liable, for the actions of the Sheriff. On February 21, 1995, this action was filed.

### IV. DISCUSSION.

Sheriff Paul's motion asserts that he is entitled to summary judgment as to (1) the official capacity claims against him because of the Eleventh Amendment and other reasons; (2) the individual capacity claims against him because of qualified immunity and the lack of causal connection between his acts and those of the deputy; and (3) the state law claims because of state law sovereign immunity. This motion is due to be GRANTED on all grounds.

Deputy Goldsmith has joined in on arguments number (1) and (3). For the same reasons as Sheriff Paul, this motion is due to be GRANTED as well.

### The Eleventh Amendment & Official Capacity Claims.

■ The Eleventh Amendment generally insulates a state from suit in federal court unless the state has waived its sovereign immunity, or Congress has abrogated the state's immunity pursuant to the Fourteenth Amendment. *See Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1429 (11th Cir. 1997). Eleventh Amendment immunity does not, however, "insulate state officials acting in their official capacities from suit in federal court, at least to the extent that the complainant seeks prospective injunctive relief" based on the Constitution. *Welch v. Laney,* 57 F.3d 1004, 1008 (11th Cir.1995). Plaintiff in this case has recognized the effect of the Amendment and has rightfully noted that his official capacity claims are pursued "only for prospective injunctive relief." *Plaintiff's Response at 18.* To the extent that the Complaint seeks relief against the parties in their official capacities for anything other than prospective injunctive relief, therefore, summary judgment is due to be granted.

■ Plaintiff is somewhat mistaken, however, as to who is the proper defendant to his official capacity claim. Plaintiff asserts in his response to the motion for summary judgment that the official capacity claim lies against, not only present Coffee County Sheriff Ben Moates, but also against "[f]ormer Coffee County Sheriff Paul" and presumably, Deputy Goldsmith as well. An official capacity claim may not, however, lie against a former Sheriff or former Deputy. Official capacity claims exist to "impose[ ] liability on the entity" that the officials represent, "and not on them as individuals." *Welch,* 57 F.3d at 1008. Indeed, claims against officers in their official capacity are "functionally equivalent" to claims against the entity that they represent. *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th

---

11. It is highly questionable whether the County would be liable for the actions of the Sheriff in this instance. That law was not firmly established at the time of the events, however. *See McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (holding that county was not liable for actions of Alabama Sheriffs in their law enforcement capacities); *Turquitt v. Jefferson County, Ala.,* 137 F.3d 1285 (11th Cir.1998) (holding that county was not liable for actions of Alabama Sheriff taken as jailer), *overruling Parker v. Williams,* 862 F.2d 1471 (11th Cir.1989).

Cir.1991). Paul no longer represents an entity that is involved in this lawsuit. He is no longer Sheriff, but works in the private sector. Goldsmith, likewise, is no longer a Deputy. He also works in the private sector.[12]

To allow official capacity claims against Paul and Goldsmith would be to allow them to be sued as representatives of an entity that they are no longer represent. That is not consistent with the purposes of official capacity suits nor is it consistent with other federal law. As prescribed by Federal Rule of Civil Procedure 25(d)

> When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the ... officer's successor is automatically substituted as a party.

The Rule does not provide that the new official is added, but rather that he is *substituted.* This action for prospective injunctive relief, i.e. the "official capacity claim," will, therefore, lie only as to the present Sheriff Ben Moates. Sheriff Moates has not moved for summary judgment on any theory, so this claim may proceed to trial.

### Section 1983 Law, in General.

■■■ Plaintiff has sued both Paul and Goldsmith in their individual capacities under 42 U.S.C. § 1983. Section 1983 is not a source of federal rights. Rather, it is merely a means for vindicating constitutional and federal statutory rights, a means for an injured party to sue state officials who infringe upon those rights. *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). In any § 1983 lawsuit, the plaintiff must initially show that he was "deprived ... of a right secured under the Constitution or federal law" in order to recover. *Willis v. University Health Services, Inc.,* 993 F.2d 837, 840 (11th Cir.1993), cert. den. 510 U.S. 976, 114 S.Ct. 468, 126 L.Ed.2d 420 (1993).[13]

In this case the issue is whether the Sheriff of Coffee County, or his deputy, violated the Fourth Amendment rights of the Plaintiff through their participation in the seizure of the automobile.

Goldsmith has not moved for summary judgment on the grounds that a prima facie violation of § 1983 has not been shown, nor has he moved for summary judgment on the grounds of qualified immunity which protects officials sued under 1983 in their individual capacity. The § 1983 claim against Goldsmith for violation of Plaintiff's Fourth Amendment rights will, therefore, remain for trial. The section 1983 damages claim against former Sheriff Paul, however, merits further discussion.

### Qualified Immunity.

■■■ As noted above, one theory which Sheriff Paul has used to argue for summary judgment is qualified immunity. Qualified immunity is a protection designed to allow government officials who are sued under § 1983 to avoid the expense and disruption of trial. *Ansley v. Heinrich,* 925 F.2d 1339, 1345 (11th Cir.1991). An official is entitled to qualified immunity if he is performing discretionary functions and his actions do " 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lancaster,* 116 F.3d at 1424. Courts are to follow a two-step analysis. First, the Defendant must show that he was performing an act within his discretionary authority. If that burden is satisfied, then it becomes the Plaintiff's duty to prove that the Defendant violated clearly established law. *See, e.g., Godby v. Montgomery Co. Bd. of Educ.,* 996 F.Supp. 1390, 1400–03 (M.D.Ala.1998).

■■■ Plaintiff in this case has chosen to contest the issue of whether Paul was acting

---

**12.** Even if Goldsmith were still a Deputy, it would not be necessary for the court to retain him as a defendant in his official-capacity. As stated above, official capacity suits exist to impose liability on the entity. Keeping the present Sheriff as a defendant is sufficient to impose prospective injunctive relief on the entity in this case. See *Godby v. Montgomery Co. Bd. of Educ.,* 996 F.Supp. 1390 (M.D.Ala.1998) (dismissing of-

ficial capacity claim against superintendent, teacher, and principal, because they were redundant of claim against local board of education); *see also Welch,* 57 F.3d at 1008 ("a sheriff's deputy is legally an extension of the sheriff").

**13.** Plaintiff must also show that Defendants acted under color of state law. Here, that issue is not contested.

within his discretionary authority at the time that these actions occurred. As this court has noted in previous opinions, this is usually an uncontested issue and one which courts are liable to skip over in their analysis. *See, e.g., Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir.1994) (skipping over issue of discretionary function to discuss clearly established law); *see also Lancaster*, 116 F.3d at 1424 (noting that parties did not dispute whether act was discretionary function). Skipping over it is not the result of mere laziness or negligence, however. Courts ignore the issue because the hurdle that the defendant must meet in showing that he was acting within his discretionary authority is a low, indeed almost invisible, one. As noted by Judge Thompson in *Sweatt v. Bailey*, 876 F.Supp. 1571, 1576 (M.D.Ala. 1995), the burden is made so easy "because of the level of generality at which this requirement must be determined." An official may show that an act was within his discretionary authority merely by showing that the acts "(1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir.1994) (finding that contracting with local jails, even ones with possibly unconstitutional conditions, was within discretion of U.S. Marshals).

■ In the present case, it cannot seriously be contested that Paul was within his duties as Sheriff in communicating with his deputy, and giving instructions to his deputy. As noted in Paul's deposition, it is his duty to supervise employees and to establish policies and customs for them to follow. Further, Alabama law allows that a Sheriff in discharging his duties "may summon to his aid as many of the men of his county as he thinks proper." Ala.Code § 15–6–1. Indeed, it is Paul's role as supervisor that is much of the *basis for the Plaintiff bringing this very action against him.* Further, it also cannot be seriously contested that Paul was acting as Sheriff when he told his deputy to keep the peace. Indeed, the Sheriff is, under Alabama law, the "principal conservator of the peace in his county, and it is his duty to suppress all riots, unlawful assemblies and affrays." Ala.Code § 15–6–1. A

belief that a person possesses good discretion to keep the peace is, indeed, the primary reason that certain persons are elected as Sheriff. Plaintiff's argument that the alleged actions of Paul were not within his discretionary authority is without merit.

Plaintiff nevertheless maintains at least one other argument against Paul's claim of discretionary authority in this case. Plaintiff appears to say that Paul could not have been acting within his discretionary authority, because there has been evidence presented that Goldsmith violated the law in this instance. Basically, it is an argument that Paul could not have been acting within his discretionary authority, because he had no discretion to violate the Constitution. This court has noted before, however, the fallacy of this argument. As stated in *Godby, supra*,

A defendant is not failing to act within his discretion merely because he or she is doing something unlawful. Indeed, if that were the test, why would the court even need to confront the issue of clearly established law? The two steps would be merely conflated into one. It is perfectly logical for a court to find that someone who was acting illegally was acting within his discretionary authority. That is why the court is called upon to decide if the official violated clearly established law (after the court finds the official was acting within his discretionary authority). *See Sweatt*, 876 F.Supp. at 1576 ("[P]olice officers must perform the duty of controlling persons after arrest ... This is not to condone the use of profanity and unnecessary force. However, these alleged acts are more properly considered in the second step of the test ...").

*Godby*, 996 F.Supp. 1390, 1402.

In sum, Sheriff Paul is entitled to the court's analysis of whether he violated clearly established law in this case. He was certainly acting within his discretionary authority, as defined in federal § 1983 law, so as to be entitled to claim the benefits of that analysis.

**Two Theories of Liability and Action.**

Before the court may move to an analysis of whether Sheriff Paul violated clearly established law in this case, the court must

necessarily pause to make clear the theories which the Plaintiff is advancing against Paul. Plaintiff is arguing not only that Paul violated the law through his personal participation in this act. Plaintiff is also arguing that Paul is liable because of his supervision exercised in this event (perhaps the more accurate characterization of Plaintiff's theory is to say lack of supervision).

■ Those who act in a supervisory capacity may, indeed, be personally liable under both of these theories under § 1983. As stated by the Eleventh Circuit in *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1192 (11th Cir.1994)

> To recover individually from [state officials] who were in supervisory or policy-making capacities, the [Plaintiff] must show that [the supervisors] are liable either through their "personal participation" in the acts comprising the alleged constitutional violation or "the existence of a causal connection" linking their actions with the violation.

The court's analysis must diverge somewhat at this point, therefore. To get past the bar of qualified immunity, Plaintiff in this case will either have to show (1) that Paul personally participated in a wrong which violated clearly established law; or (2) that Paul's supervision, or lack thereof, of Goldsmith was both causally connected to a violation of clearly established law, and itself, violated clearly established law. Neither can be done.

### The Clearly Established Law.

■ In *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821 (11th Cir.1997) cert. den. —— U.S. ——, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997), the Eleventh Circuit reaffirmed the *Lassiter* doctrine: that a previous case must be factually on all fours with the present situation for qualified immunity to not apply. Or, as put in *Lassiter*, the law must have "earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors in the defendant's place, that 'what he is doing' violates federal law." *Lassiter*, 28 F.3d at 1149. The analysis does not focus on analogies. Rather, the analysis "focuses on the actual, on the specific, on the details of concrete cases." *Id.* at 1149–50.

The requirement to deny qualified immunity is not one of "factual rigidity." *Nicholson v. Georgia Dept. of Human Resources*, 918 F.2d 145, 147 (11th Cir.1990). Nevertheless, there is a strong burden of similarity. A "government agent's act [must be] so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law" would engage in it. *Lassiter*, 28 F.3d at 1149. To not require this would be to allow the Plaintiffs to "discharge their burden" of defeating qualified immunity by "referring to general rules and to the violation of 'abstract' rights." *Id.* at 1150.

In the present suit, Paul has readily "acknowledge[d] (both at the time of the incident and now) that it is unlawful for deputies to seize property, or assist in the seizure of property, without a proper court order or writ of execution." *Def.'s Brief at 7*. Paul's theory is, however, that it is lawful (at least it is not clearly established that it is unlawful) for an officer to accompany a private citizen on a repossession to prevent a breach of the peace, and that it would consequently be lawful (at least not clearly unlawful) for a Sheriff to so instruct his deputy. *See Def.'s Brief at 7*.

Defendant's theory is, in fact, supported in the law of the Eleventh Circuit. As stated by the Eleventh Circuit in *Cofield v. Randolph County Comm'n*, 90 F.3d 468, 471 (11th Cir.1996), it is "plain that an officer's mere presence during a lawful repossession is of no moment. Indeed, arguably, an officer's 'mere presence to prevent a breach of the peace' would not even constitute state action sufficient to give the court subject matter jurisdiction." *Cofield* concerned an automobile dealership's seizure of a vehicle from a customer because the customer had lied about the age of a trade-in. *Id.* at 469. The court affirmed a dismissal based on qualified immunity in favor of a deputy who was present at the seizure. Part of the *Cofield* case turned on the fact that the seizure was not patently unlawful under Alabama law. *Id.* at 471. Nevertheless, the case also turned on the fact that the law officer was

not present until after the seizure took place. The officer was entitled to qualified immunity in that context because the court could find "no precedent clearly holding that an officer's mere presence at (or after) a lawful instance of self-help repossession can amount to a violation of the Fourth and Fourteenth Amendments." *Id.* at 472. If no such precedent existed by 1996, clearly one did not exist at the time of Wilson's seizure in 1994. In so holding the court noted, however, that previous cases, particularly *Menchaca,* "suggest[ed] 'that state action might be present if an officer were to facilitate a repossession" without lawful process. *Id.* at 471.

*Cofield* distinguished *Soldal v. Cook County, Ill.,* 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). There, the Supreme Court confronted a situation where a private party evicted a tenant-by removing the tenant's trailer home from landlord's park-without the required eviction judgment. *Id.* at 58, 113 S.Ct. 538. Deputy sheriffs actually participated in this seizure, not only to keep the peace, but to "forestall any possible resistance." *Id.* The deputies then refused to file a complaint for the victim, even though the victim requested one. *Id.* at 58–59, 113 S.Ct. 538. The Supreme Court held that a claim for violation of the Fourth Amendment could be stated in this situation, because the action constituted an unlawful seizure under the Fourth Amendment. *Id.* at 72, 113 S.Ct. 538. *Soldal* clearly establishes, therefore, that knowing participation by a law officer to effect an unlawful seizure is a violation of the Fourth Amendment. The Court noted that "had the ejection in this case properly awaited the state court's judgment it is quite unlikely that the federal court would have been bothered with a § 1983 action alleging a Fourth Amendment violation." *Id.* at 71, 113 S.Ct. 538.

*Soldal* had also been predated by a binding decision in this court's circuit, *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507 (5th Cir.1980), which is also on point.[14] There, the Circuit court created the safe harbor in which Paul claims he fits. In *Menchaca,* it

was uncontested that the officers were there only to prevent further "disturbance related to loud and abusive language" by the victim of a private repossession of a car. *Id.* at 511. The court actually dismissed the lawsuit as failing the test of subject matter jurisdiction. Where the officers were only there in the capacity to prevent a breach of the peace, "the critical element state action was absent" in the seizure. *Id.* at 513. The court "agree[d] with the dissent's contention that police intervention and aid in this repossession by defendant Chrysler's agents would constitute state action; however, the testimony failed to show such intervention and aid." *Id.* at 513.

Viewing factually similar contexts in the cases of *Cofield, Soldal,* and *Menchaca,* the court finds that it agrees with the Defendant's presentation of clearly established law: an officer may not actively assist or participate in a private seizure, unless the officer has the proper process ordering him to do so. Nevertheless, there is no clearly established violation—in fact it is clearly established that there is not a violation—where an officer merely is present at a private seizure to prevent a breach of the peace.

The real question is not, therefore, what is the clear law in this instance? Rather, the principal question is, have the Plaintiffs presented evidence that Paul violated this clearly established law, either through personal action or through another cause? Potential liability for personal participation, and potential liability for his supervision will be analyzed separately.

### Paul's Personal Participation.

There is some question here whether Paul ever did anything that amounts to "personal participation" by him in the alleged wrong. In *Cofield,* the Eleventh Circuit stated that "arguably an officer's 'mere presence to prevent a breach of the peace' would not even constitute state action sufficient to give the court subject matter jurisdiction." 90 F.3d at 471, citing to *Booker v. City of Atlanta,* 776 F.2d 272, 274 (11th Cir.1985). Without

---

14. Decisions of the Fifth Circuit prior to the creation of the Eleventh Circuit are binding precedent in the Eleventh Circuit. *Bonner v. City of*

*Prichard, Ala.,* 661 F.2d 1206 (11th Cir.1981) (en banc).

participation in the seizure, there is simply no deprivation, or seizure by the state at all.

Nevertheless, even if the court construes Paul's acts to be "personal" action, the evidence as presented by the Plaintiff cannot amount to evidence of "personal participation" in the alleged Constitutional violation. There is no evidence that Paul personally forced Billy Williams to give up the vehicle; there is no evidence that Paul even communicated with the Williams; indeed, there is not even any evidence that Paul instructed or passively allowed his deputy to participate in an illegal seizure.

The only evidence regarding Paul's personal participation are the radio and telephone communications between Paul and Goldsmith. For the most part, the only evidence of the substance of these conversations establishes that Paul instructed his officer on the fine points of seizure law, reminding the officer of his duty not to effect a seizure without lawful process. Plaintiff has not presented any evidence to contest this substance. (Indeed, since Plaintiff nor none of the witnesses supporting him were privy to these conversations, it would be impossible for him to present contradictory evidence. The only way to present evidence that Paul told Goldsmith to violate the law would be to have Paul or Goldsmith, or an eavesdropper, testify to such. No such evidence is before the court.)

The only things possibly amounting to incriminating evidence of Paul that the Plaintiff can advance are the communications between Paul and Goldsmith that Teresa Williams overheard on her scanner. Even if the court were to view this as personal participation (as opposed to supervision), the court cannot find anything amounting to a violation of the law. Paul simply questioned the officer about the status of the events. Goldsmith replied that everything was ok. This is not evidence that Paul was instructing Goldsmith to violate the law. Further, the court has found no precedent, and the Plain-

tiff has not presented one, which would show it to be a personal violation by the Sheriff to allow his deputy on the scene to handle matters. In any event, even if that could be shown to be some sort of violation, it would not—as a common sense matter—amount to "personal participation." Rather, it would amount to supervision or policy-making. That is a separate discussion.

### *Individual Liability for Supervisory Acts.*

As noted above, Sheriffs and other policy-making and supervisory officials may be held liable in their individual capacity not only for personal participation, but also for what could be loosely termed, really bad supervision.[15] In order to find the supervisor liable under this theory, more than merely respondeat superior liability must be shown. *Braddy v. Florida Dept. of Labor & Emp. Sec.*, 133 F.3d 797, 801 (11th Cir.1998). Indeed, the Eleventh Circuit just recently characterized the "standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate [as an] *extremely rigorous* " standard for a plaintiff to satisfy. *Id.* at 802 (emphasis added). This standard may only be satisfied "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation and he fails to do so," *id.* at 802, or, where the supervisor establishes an official policy that directly leads to the violation.

In the present case, there is no evidence establishing a pattern of abusive participation by the Sheriff's department in seizures sufficient to establish the personal liability of Paul. In order to meet this standard, the Eleventh Circuit has stated that the deprivations must "constitute widespread abuse sufficient to notify the supervising official" and must be "obvious, flagrant, rampant, and of continued duration." *Braddy*, 133 F.3d at 802. The violations certainly cannot just amount to "isolated occurrences." *Id.* In this case, the only evidence offered of prior viola-

---

**15.** Also, apparently a "violation of a duty imposed by state law resulting in constitutional injury will establish a causal connection sufficient to trigger supervisory liability." *H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1087 (11th Cir.1986) (holding supervisor liable for "authori-

zation and implementation of isolation for a period well beyond the Florida HRS guidelines."). This theory has not been advanced against Paul in this case. At least, no separate evidence has been presented which is not otherwise analyzed.

tions was the testimony of the Sheriff. He said that there had been none. This certainly cannot amount to widespread abuse, much less the type of widespread abuse sufficient to hold the Sheriff liable.[16]

As stated by the Eleventh Circuit in *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 706 (11th Cir.1985), liability against a Sheriff could also be established if the Plaintiff could show that the Sheriff "established or utilized a policy or custom" that amounted to a violation. A Sheriff may not simply be held liable for the unreasonable actions of his officers, especially when he possesses only "limited information" as to the officer's actions at that moment, and has not specifically approved the particular actions of the officer. *Ortega v. Christian,* 85 F.3d 1521, 1526 (11th Cir.1996) (dismissing false arrest claim pled against Police Chief, even though claim allowed against arresting officer). Rather, the court must look to see "whether the supervisors' actions or omissions with respect to . . . training and . . . policies would violate any clearly established constitutional right." *McKinney by McKinney v. DeKalb County, Ga.,* 997 F.2d 1440, 1443 (11th Cir.1993) (dismissing excessive use of force claim against Chief of Police and Director of Public Safety, but remanding for trial as to officer who allegedly used excessive force).

The easiest way to establish liability of Paul might be to show a written policy which allows deputies to mediate disputes between private parties, and assist one party in seizing property without any sort of authority. This would show, in effect, that violations of the law were "officially sanctioned or ordered." *See Floyd v. Waiters,* 133 F.3d 786, 793 (11th Cir.1998). In the present case, there is no evidence that Paul somehow "officially sanctioned or ordered" this conduct. Rather, the court must look to unwritten policies.

Even when the court looks to such unwritten policies, however, there is no evidence that any unwritten policy of Paul was anything other than constitutional. The deputy was apparently aware of his authority (whether he followed it or not), as was the Sheriff. Those who are charged with the status of final policymaker, as is Paul, may set official policy with only one act. *Morro v. City of Birmingham,* 117 F.3d 508, 510 (11th Cir.1997), cert. den. —— U.S. ——, 118 S.Ct. 1299, 140 L.Ed.2d 465 (1998). Here, there is no evidence, however, that Paul set an unconstitutional policy, or said anything to lead Goldsmith to believe that he should pursue an unconstitutional policy in this particular instance.

If any proof of anything has been advanced against the Sheriff, it is that he refused to call Teresa Williams back; instead, allowing Goldsmith to handle the events. Plaintiff has pointed the court towards nothing which would hold that policy of allowing deputies on the scene to handle events, as opposed to intervening when not present, is unconstitutional. The Constitution does not require a Sheriff to constantly provide on-the-scene, hands-on supervision of his deputies. *Cf. Hill,* 40 F.3d at 1193 ("The Constitution does not require 'a prison to station a full-time guard outside each cell to prevent' sexual assaults from occurring'"). Indeed, Paul's policy strikes the court as a rational, and indeed good, policy. The intervention of the Sheriff by telephone would do little more than complicate an already complicated, and difficult to handle, situation.

The fact that something wrong occurred—at least something wrong occurred according to the Plaintiff's testimony—is also not itself evidence of an unconstitutional policy of the Sheriff. Indeed, the facts as alleged by Plaintiff are "precisely the type of occurrence that [Paul] sought to prevent with the policies and procedures that he instituted." *Hill,* 40 F.3d at 1193 (granting qualified immunity to supervisor in § 1983 case). In any event, in no way has there been evidence presented that Paul's policies "demonstrate the necessary callous indifference in policymaking to hold [Paul] personally or individu-

---

16. Of course, since this is a claim against the former Sheriff in his individual capacity, Paul would be entitled to qualified immunity unless his supervisory act could also be shown to violate clearly established law. Therefore, even if the Plaintiff could show that there were prior violations, Plaintiff's theory would fail because he had not shown that the number of prior occasions was clearly established as sufficient to put Paul on notice.

ally liable." *Id.* Summary judgment in Paul's favor on the § 1983 claims is due to be granted.

### State Law Claims.

 In its order on the motion to dismiss, the court allowed certain state law claims against the Defendants to go forward despite the assertion of sovereign immunity. Applying subsequent Eleventh Circuit opinions, this was error.

The Eleventh Circuit has now interpreted Alabama state law immunity to be absolute for Sheriffs. As noted in *McMillian v. Johnson*, 101 F.3d 1363, 1365 (11th Cir.1996), cert. den. —— U.S. ——, 117 S.Ct. 2514, 138 L.Ed.2d 1016 (1997), state court opinions apparently provide "no clear answer" as to the extent of sovereign immunity for Sheriffs. Nevertheless, according to *McMillian*, the Eleventh Circuit in *Tinney v. Shores*[17] established a "clear" answer for Alabama—at least for this district court—by holding that "a claim against an Alabama sheriff in his individual capacity is barred by the doctrine of sovereign immunity," whether it be one for negligence or one for an intentional tort. *McMillian*, 101 F.3d at 1364–65 (reversing trial court which had held that officials were not entitled to immunity for "intentional or malicious wrongdoing in their individual capacities").[18] The clarity of the decision in *Tinney* has been further noted in *Sheth v. Webster*, 137 F.3d 1447 (11th Cir.1998) (distinguishing discretionary function immunity available to municipal police officers from "absolute 'sovereign' immunity, except for in-

junctive relief, afforded to certain state constitutional officers, including sheriffs and deputy sheriffs").

Any apparent confusion of the Alabama courts is not important, therefore, for district courts. The Eleventh Circuit has said that immunity clearly applies; therefore it does. *McMillian*, 101 F.3d at 1365. Since the Eleventh Circuit's decisions are binding on this court, its interpretation must be considered by this court to be a correct statement of Alabama law. *See Flood v. State of Ala. Dept. of Ind. Rel.*, 948 F.Supp. 1535, 1549 n. 53 (M.D.Ala.1996) ("Similarly, this court is bound by *Tinney*, regardless as to whether *Tinney* is right or wrong under Alabama law.").

This sort of immunity does not stop with the Sheriff, however. The Eleventh Circuit has also held that this type of absolute immunity extends to the Sheriff's employees as well. In *Lancaster*, 116 F.3d at 1431 (granting sovereign immunity on state law claims to Sheriff and jailers), the court held that there was "no reasonable basis for distinguishing claims against the jailers from claims against the Sheriff." If jailers are not distinguished from Sheriffs by the Eleventh Circuit, neither are deputies. *See Tinney*, 77 F.3d at 383 ("Under Alabama law, both sheriffs and deputy sheriffs are considered executive officers of the state, immune from suit under Section 14 of the Alabama constitution), *Sheth*, cited above; *see also Welch*, 57 F.3d at 1008 ("sheriff's deputy is legally an extension of the sheriff and is likewise immune from suit").[19]

---

**17.** 77 F.3d 378 (11th Cir.1996).

**18.** The Alabama Supreme Court has cited *Tinney* as a correct statement of the law. The Alabama decision implies that *Tinney* may be limited to suits against Sheriffs and Deputies. In other words, those officials are entitled to a special form of immunity. *Ex parte Purvis*, 689 So.2d 794, 796 n. 2 (Ala.1996); *see also id.* at 796–97 (Houston, concurring specially). This implication was recognized by the Eleventh Circuit in *Sheth*, cited above.

In *McMillian*, the Eleventh Circuit even goes so far as to say that some of the language in *Tinney* is "confusing." 101 F.3d at 1365. The panel maintained that "the holding of the case" was nevertheless "clear", however: "under Alabama law, a claim against an Alabama sheriff in

his individual capacity is barred by the doctrine of sovereign immunity." *Id.* The panel in *McMillian* was as bound by *Tinney* as this court is by both of those decisions. *Id.* ("We are bound to follow *Tinney*, and do so.")

**19.** Although *Tinney* and *McMillian* are not exactly clear on this point, it goes without saying that the Sheriff and Deputy must be in some way acting as Sheriff and Deputy in order to be entitled to immunity. They can't simply be cloaked with immunity for all actions that they take at any time of day. If they have a traffic accident while on their personal vehicle on their way to the grocery store, they would be liable just as is any other Alabamian.

The court has no trouble finding that Paul and Goldsmith were within acting with discretion at the time of the alleged actions, however. The

Sheriffs may apparently be subject to suit under Alabama law in some, very limited circumstances. In *McMillian*, 101 F.3d at 1365 n. 2, the Sheriff in that case admitted for purposes of that case, and the court cited with approval a decision from the Alabama Supreme Court in 1987 which allowed Sheriffs to be sued

> for actions brought (1) to compel him to perform his duties, (2) to compel him to perform ministerial acts, (3) to enjoin him from enforcing unconstitutional laws, (4) to enjoin him from acting in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law, or (5) to seek construction of a statute under the Declaratory Judgement Act if he is a necessary party for the construction of the statute.

*See also Tinney*, 77 F.3d at 383 n. 4 (discussing same five exceptions). None of those actions would apply to Paul or Goldsmith. All five amount to something like prospective injunctive relief, which simply is not applicable to someone who no longer holds an office. In any event, as noted in footnote 1 of this court's opinion in this case on the motion to dismiss, the claims stated by Plaintiff under state tort law "seek only damages, not prospective relief." *Williams*, 905 F.Supp. at 998. The exceptions, therefore, simply are not applicable to this case.

Plaintiff has moved this court to certify a question to the Alabama Supreme Court to clarify the status of immunity for Sheriffs and their deputies. Indeed, even the Eleventh Circuit in *McMillian* has said that the issues of state law are quite unclear. This court also recently traced much of the unclear status of this law—especially as regards state officials other than Sheriffs—in its decision in *Godby v. Montgomery Co. Bd. of Educ.*, 996 F.Supp. 1390 (M.D.Ala.1998).[20] Nevertheless, this district court does not view itself as in the position to certify questions to the Alabama Supreme Court regarding this issue. As stated earlier, the Eleventh Circuit in *Tinney* said the issue is clear; therefore, as far as this court is to be concerned, the issue is clear. Furthermore, *Tinney* has been cited as a clear and correct statement of the law in *McMillian, Sheth,* and one Alabama Supreme Court decision as well. Plaintiff may, of course, plead his case to the Eleventh Circuit, which may reconsider its own decision, or certify questions itself.

## V. *CONCLUSION.*

The court GRANTS summary judgment as to former Sheriff Brice Paul as to all counts submitted against him. Former Sheriff Paul cannot be held liable in his official capacity for prospective injunctive relief because he no longer has an official capacity to enjoin. Former Sheriff Paul is also entitled to quali-

"administration and direction of" employees has been held to be a discretionary act under Alabama law. *Nance By and Through Nance v. Matthews*, 622 So.2d 297, 300 (Ala.1993). That was the role which Paul was acting in these circumstances. Likewise, attempts to keep the peace are also within the discretionary authority of officers. Keeping the peace is, in fact, the ultimate discretionary act—and the court has no doubt the biggest worry—of peace officers. *Sheth*, cited above (11th Cir.) (defining discretionary acts under state law as "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances ."), quoting from *Wright v. Wynn*, 682 So.2d 1, 2 (Ala.1996); *see also* Ala.Code § 15-6-1. Goldsmith may have violated the Constitution in this case. Nevertheless, that does not strip him of sovereign immunity. *See, e.g., White v. Birchfield*, 582 So.2d 1085, 1087 (Ala.1991) ("however unwise in hindsight [the deputy's] actions may seem, we hold that his

decision to respond to the call regarding the suicide in progress and to drive at what is alleged to have been an excessive speed, was, in the context of the situation, within the scope of his discretionary functions as a deputy sheriff.").

20. This court's statements in *Godby* regarding immunity for state school officials under state law are now suspect given the Eleventh Circuit's subsequent opinion in *Sheth.* There the Eleventh Circuit held that state and local officials—other than constitutional officials such as sheriffs and deputies—are entitled to a qualified form of immunity known as discretionary function immunity. The Eleventh Circuit's opinion basically equates the idea of state law discretionary immunity, which turns on whether the official acted with bad faith, fraud, malice, or wilfulness, with the concept of federal law qualified immunity, which turns on whether the officer violated clearly established law. *Sheth* ("Under both Alabama law and federal law, the core issue is whether a defendant violated clearly established law").

fied immunity as to all claims asserted against him in his individual capacity. Finally, former Sheriff Paul cannot be held liable under state tort law because of the functioning of state law sovereign immunity.

Former Deputy Goldsmith, likewise, may not be held liable in an official capacity, because he, also, no longer serves in any official state capacity. Goldsmith is also entitled to state law sovereign immunity for the state tort law claims asserted against him. This case will proceed against Goldsmith in his individual capacity only under a § 1983 claim for violation of the Plaintiff's Fourth Amendment rights (as applied to the states via the Fourteenth Amendment), to resolve the obvious factual disputes.

The case may also proceed to trial against current Sheriff Ben Moates in his official capacity. In this capacity, the Plaintiff may only be awarded prospective injunctive relief. The court does not understand what prospective injunctive relief the Plaintiff seeks, nor what form that relief would take in this case. Nevertheless, Moates has not moved for summary judgment and none can be granted.