# SOLDAL ET UX. *v.* COOK COUNTY, ILLINOIS, ET AL.

No. 91–6516.  Argued October 5, 1992—Decided December 8, 1992

WHITE, J., delivered the opinion for a unanimous Court.

*John L. Stainthorp* argued the cause and filed briefs for petitioners.

*Kenneth L. Gillis* argued the cause for respondents. With him on the brief were *Jack O'Malley, Renee G. Goldfarb,* and *Kenneth T. McCurry.**

JUSTICE WHITE delivered the opinion of the Court.

I

Edward Soldal and his family resided in their trailer home, which was located on a rented lot in the Willoway Terrace

---

*James D. Holzhauer, Timothy S. Bishop, John A. Powell, Steven R. Shapiro, Harvey M. Grossman,* and *Alan K. Chen* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

*Richard Ruda, Carter G. Phillips, Mark D. Hopson,* and *Mark E. Haddad* filed a brief for the National League of Cities et al. as *amici curiae* urging affirmance.

mobile home park in Elk Grove, Illinois. In May 1987, Terrace Properties, the owner of the park, and Margaret Hale, its manager, filed an eviction proceeding against the Soldals in an Illinois state court. Under the Illinois Forcible Entry and Detainer Act, Ill. Rev. Stat., ch. 110, ¶ 9–101 *et seq.* (1991), a tenant cannot be dispossessed absent a judgment of eviction. The suit was dismissed on June 2, 1987. A few months later, in August 1987, the owner brought a second proceeding of eviction, claiming nonpayment of rent. The case was set for trial on September 22, 1987.

Rather than await judgment in their favor, Terrace Properties and Hale, contrary to Illinois law, chose to evict the Soldals forcibly two weeks prior to the scheduled hearing. On September 4, Hale notified the Cook County's Sheriff's Department that she was going to remove the trailer home from the park, and requested the presence of sheriff deputies to forestall any possible resistance. Later that day, two Terrace Properties employees arrived at the Soldals' home accompanied by Cook County Deputy Sheriff O'Neil. The employees proceeded to wrench the sewer and water connections off the side of the trailer home, disconnect the phone, tear off the trailer's canopy and skirting, and hook the home to a tractor. Meanwhile, O'Neil explained to Edward Soldal that "'he was there to see that [Soldal] didn't interfere with [Willoway's] work.'" Brief for Petitioner 6.

By this time, two more deputy sheriffs had arrived at the scene and Soldal told them that he wished to file a complaint for criminal trespass. They referred him to Deputy Lieutenant Jones, who was in Hale's office. Jones asked Soldal to wait outside while he remained closeted with Hale and other Terrace Properties employees for over 20 minutes. After talking to a district attorney and making Soldal wait another half hour, Jones told Soldal that he would not accept a complaint because "'it was between the landlord and the tenant . . . [and] they were going to go ahead and continue to move

out the trailer.'" *Id.*, at 8.[1] Throughout this period, the deputy sheriffs knew that Terrace Properties did not have an eviction order and that its actions were unlawful. Eventually, and in the presence of an additional two deputy sheriffs, the Willoway workers pulled the trailer free of its moorings and towed it onto the street. Later, it was hauled to a neighboring property.

On September 9, the state judge assigned to the pending eviction proceedings ruled that the eviction had been unauthorized and ordered Terrace Properties to return the Soldals' home to the lot. The home, however, was badly damaged.[2] The Soldals brought this action under 42 U. S. C. § 1983, alleging a violation of their rights under the Fourth and Fourteenth Amendments. They claimed that Terrace Properties and Hale had conspired with Cook County deputy sheriffs to unreasonably seize and remove the Soldals' trailer home. The District Judge granted defendants' motion for summary judgment on the grounds that the Soldals had failed to adduce any evidence to support their conspiracy theory and, therefore, the existence of state action necessary under § 1983.[3]

The Court of Appeals for the Seventh Circuit, construing the facts in petitioners' favor, accepted their contention that there was state action. However, it went on to hold that

---

[1] Jones' statement was prompted by a district attorney's advice that no criminal charges could be brought because, under Illinois law, a criminal action cannot be used to determine the right of possession. See Ill. Rev. Stat., ch. 110, ¶ 9–101 *et seq.* (1991); *People* v. *Evans,* 163 Ill. App. 3d 561, 516 N. E. 2d 817 (1st Dist. 1987).

[2] The Soldals ultimately were evicted per court order in December 1987.

[3] Title 42 U. S. C. § 1983 provides that:

"Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

the removal of the Soldals' trailer did not constitute a seizure for purposes of the Fourth Amendment or a deprivation of due process for purposes of the Fourteenth.

On rehearing, a majority of the Seventh Circuit, sitting en banc, reaffirmed the panel decision.[4]  Acknowledging that what had occurred was a "seizure" in the literal sense of the word, the court reasoned that, because it was not made in the course of public law enforcement and because it did not invade the Soldals' privacy, it was not a seizure as contemplated by the Fourth Amendment.  942 F. 2d 1073, 1076 (1991).  Interpreting prior cases of this Court, the Seventh Circuit concluded that, absent interference with privacy or liberty, a "pure deprivation of property" is not cognizable under the Fourth Amendment.  *Id.*, at 1078–1079.  Rather, petitioners' property interests were protected only by the Due Process Clauses of the Fifth and Fourteenth Amendments.[5]

We granted certiorari to consider whether the seizure and removal of the Soldals' trailer home implicated their Fourth Amendment rights, 503 U. S. 918 (1992), and now reverse.[6]

---

[4] The court reiterated the panel's conclusion that a conspiracy must be assumed on the state of the record and, therefore, that the case must be treated in its current posture "as if the deputy sheriffs themselves seized the trailer, disconnected it from the utilities, and towed it away."  942 F. 2d 1073, 1075 (1991).

[5] The court noted that, in light of the existence of adequate judicial remedies under state law, a claim for deprivation of property without due process of law was unlikely to succeed.  *Id.*, at 1075–1076.  See *Parratt* v. *Taylor*, 451 U. S. 527 (1981).  In any event, the Soldals did not claim a violation of their procedural rights.  As noted, the Seventh Circuit also held that respondents had not violated the Soldals' substantive due process rights under the Fourteenth Amendment.  Petitioners assert that this was error, but in view of our disposition of the case we need not address the question at this time.

[6] Under 42 U. S. C. § 1983, the Soldals were required to establish that the respondents, acting under color of state law, deprived them of a constitutional right, in this instance, their Fourth and Fourteenth Amendment freedom from unreasonable seizures by the State.  See *Monroe* v. *Pape*,

## II

The Fourth Amendment, made applicable to the States by the Fourteenth, *Ker* v. *California*, 374 U. S. 23, 30 (1963), provides in pertinent part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

A "seizure" of property, we have explained, occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States* v. *Jacobsen*, 466 U. S. 109, 113 (1984). In addition, we have emphasized that "at the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home." *Silverman* v. *United States*, 365 U. S. 505, 511 (1961). See also *Oliver* v. *United States*, 466 U. S. 170, 178–179 (1984); *Wyman* v. *James*, 400 U. S. 309, 316 (1971); *Payton* v. *New York*, 445 U. S. 573, 601 (1980).

As a result of the state action in this case, the Soldals' domicile was not only seized, it literally was carried away, giving new meaning to the term "mobile home." We fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment. Whether the Amendment was in fact

---

365 U. S. 167, 184 (1961). Respondents request that we affirm on the ground that the Court of Appeals erred in holding that there was sufficient state action to support a § 1983 action. The alleged injury to the Soldals, it is urged, was inflicted by private parties for whom the county is not responsible. Although respondents did not cross-petition, they are entitled to ask us to affirm on that ground if such action would not enlarge the judgment of the Court of Appeals in their favor. The Court of Appeals found that because the police prevented Soldal from using reasonable force to protect his home from private action that the officers knew was illegal, there was sufficient evidence of conspiracy between the private parties and the officers to foreclose summary judgment for respondents. We are not inclined to review that holding. See *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 152–161 (1970).

violated is, of course, a different question that requires determining if the seizure was reasonable. That inquiry entails the weighing of various factors and is not before us.

The Court of Appeals recognized that there had been a seizure, but concluded that it was a seizure only in a "technical" sense, not within the meaning of the Fourth Amendment. This conclusion followed from a narrow reading of the Amendment, which the court construed to safeguard only privacy and liberty interests while leaving unprotected possessory interests where neither privacy nor liberty was at stake. Otherwise, the court said,

> "a constitutional provision enacted two centuries ago [would] make every repossession and eviction with police assistance actionable under—of all things—the Fourth Amendment[, which] would both trivialize the amendment and gratuitously shift a large body of routine commercial litigation from the state courts to the federal courts. That trivializing, this shift, can be prevented by recognizing the difference between possessory and privacy interests." 942 F. 2d, at 1077.

Because the officers had not entered Soldal's house, rummaged through his possessions, or, in the Court of Appeals' view, interfered with his liberty in the course of the eviction, the Fourth Amendment offered no protection against the "grave deprivation" of property that had occurred. *Ibid.*

We do not agree with this interpretation of the Fourth Amendment. The Amendment protects the people from unreasonable searches and seizures of "their persons, houses, papers, and effects." This language surely cuts against the novel holding below, and our cases unmistakably hold that the Amendment protects property as well as privacy.[7] This

---

[7] In holding that the Fourth Amendment's reach extends to property as such, we are mindful that the Amendment does not protect possessory interests in all kinds of property. See, *e. g., Oliver* v. *United States,* 466 U. S. 170, 176–177 (1984). This case, however, concerns a house, which the Amendment's language explicitly includes, as it does a person's effects.

much was made clear in *Jacobsen, supra,* where we explained that the first Clause of the Fourth Amendment

> "protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs where there is some meaningful interference with an individual's possessory interests in that property." 466 U. S., at 113 (footnote omitted).

See also *id.,* at 120; *Horton* v. *California,* 496 U. S. 128, 133 (1990); *Arizona* v. *Hicks,* 480 U. S. 321, 328 (1987); *Maryland* v. *Macon,* 472 U. S. 463, 469 (1985); *Texas* v. *Brown,* 460 U. S. 730, 747–748 (1983) (STEVENS, J., concurring in judgment); *United States* v. *Salvucci,* 448 U. S. 83, 91, n. 6 (1980). Thus, having concluded that chemical testing of powder found in a package did not compromise its owner's privacy, the Court in *Jacobsen* did not put an end to its inquiry, as would be required under the view adopted by the Court of Appeals and advocated by respondents. Instead, adhering to the teachings of *United States* v. *Place,* 462 U. S. 696 (1983), it went on to determine whether the invasion of the owners' "possessory interests" occasioned by the destruction of the powder was reasonable under the Fourth Amendment. *Jacobsen, supra,* at 124–125. In *Place,* although we found that subjecting luggage to a "dog sniff" did not constitute a search for Fourth Amendment purposes because it did not compromise any privacy interest, taking custody of Place's suitcase was deemed an unlawful seizure for it unreasonably infringed "the suspect's possessory interest in his luggage." 462 U. S., at 708.[8] Although lacking a privacy component, the property rights in both instances nonetheless were not

___

[8] *Place* also found that to detain luggage for 90 minutes was an unreasonable deprivation of the individual's "liberty interest in proceeding with his itinerary," which also is protected by the Fourth Amendment. 462 U. S., at 708–710.

disregarded, but rather were afforded Fourth Amendment protection.

Respondents rely principally on precedents such as *Katz v. United States*, 389 U. S. 347 (1967), *Warden, Maryland Penitentiary v. Hayden*, 387 U. S. 294 (1967), and *Cardwell v. Lewis*, 417 U. S. 583 (1974), to demonstrate that the Fourth Amendment is only marginally concerned with property rights. But the message of those cases is that property rights are not the sole measure of Fourth Amendment violations. The *Warden* opinion thus observed, citing *Jones v. United States*, 362 U. S. 257 (1960), and *Silverman v. United States*, 365 U. S. 505 (1961), that the "principal" object of the Amendment is the protection of privacy rather than property and that "this shift in emphasis from property to privacy has come about through a subtle interplay of substantive and procedural reform." 387 U. S., at 304. There was no suggestion that this shift in emphasis had snuffed out the previously recognized protection for property under the Fourth Amendment. *Katz*, in declaring violative of the Fourth Amendment the unwarranted overhearing of a telephone booth conversation, effectively ended any lingering notions that the protection of privacy depended on trespass into a protected area. In the course of its decision, the *Katz* Court stated that the Fourth Amendment can neither be translated into a provision dealing with constitutionally protected areas nor into a general constitutional right to privacy. The Amendment, the Court said, protects individual privacy against certain kinds of governmental intrusion, "but its protections go further, and often have nothing to do with privacy at all." 389 U. S., at 350.

As for *Cardwell*, a plurality of this Court held in that case that the Fourth Amendment did not bar the use in evidence of paint scrapings taken from and tire treads observed on the defendant's automobile, which had been seized in a parking lot and towed to a police lockup. Gathering this evidence was not deemed to be a search, for nothing from the

interior of the car and "no personal effects, which the Fourth Amendment traditionally has been deemed to protect" were searched or seized. 417 U. S., at 591 (opinion of BLACKMUN, J.). No meaningful privacy rights were invaded. But this left the argument, pressed by the dissent, that the evidence gathered was the product of a warrantless and hence illegal seizure of the car from the parking lot where the defendant had left it. However, the plurality was of the view that, because under the circumstances of the case there was probable cause to seize the car as an instrumentality of the crime, Fourth Amendment precedent permitted the seizure without a warrant. *Id.*, at 593. Thus, both the plurality and dissenting Justices considered the defendant's auto deserving of Fourth Amendment protection even though privacy interests were not at stake. They differed only in the degree of protection that the Amendment demanded.

The Court of Appeals appeared to find more specific support for confining the protection of the Fourth Amendment to privacy interests in our decision in *Hudson* v. *Palmer*, 468 U. S. 517 (1984). There, a state prison inmate sued, claiming that prison guards had entered his cell without consent and had seized and destroyed some of his personal effects. We ruled that an inmate, because of his status, enjoyed neither a right to privacy in his cell nor protection against unreasonable seizures of his personal effects. *Id.*, at 526–528, and n. 8; *id.*, at 538 (O'CONNOR, J., concurring). Whatever else the case held, it is of limited usefulness outside the prison context with respect to the coverage of the Fourth Amendment.

We thus are unconvinced that any of the Court's prior cases supports the view that the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty is also implicated. What is more, our "plain view" decisions make untenable such a construction of the Amendment. Suppose, for example, that police officers lawfully enter a house, by either complying with the warrant requirement or satisfying one of its recognized exceptions—

*e. g.,* through a valid consent or a showing of exigent circumstances. If they come across some item in plain view and seize it, no invasion of personal privacy has occurred. *Horton,* 496 U. S., at 133–134; *Brown, supra,* at 739 (opinion of REHNQUIST, J.). If the boundaries of the Fourth Amendment were defined exclusively by rights of privacy, "plain view" seizures would not implicate that constitutional provision at all. Yet, far from being automatically upheld, "plain view" seizures have been scrupulously subjected to Fourth Amendment inquiry. Thus, in the absence of consent or a warrant permitting the seizure of the items in question, such seizures can be justified only if they meet the probable-cause standard, *Arizona* v. *Hicks,* 480 U. S. 321, 326–327 (1987),[9] and if they are unaccompanied by unlawful trespass, *Horton,* 496 U. S., at 136–137.[10] That is because, the absence of a privacy interest notwithstanding, "[a] seizure of the article . . . would obviously invade the owner's possessory interest." *Id.,* at 134; see also *Brown,* 460 U. S., at 739 (opinion of REHNQUIST, J.). The plain-view doctrine "merely reflects an application of the Fourth Amendment's central requirement of reasonableness to the law governing seizures of property." *Ibid.; Coolidge* v. *New Hampshire,* 403 U. S. 443, 468 (1971); *id.,* at 516 (WHITE, J., concurring and dissenting).

The Court of Appeals understandably found it necessary to reconcile its holding with our recognition in the plain-view cases that the Fourth Amendment protects property as such. In so doing, the court did not distinguish this case on the ground that the seizure of the Soldals' home took place in a

---

[9] When "operational necessities" exist, seizures can be justified on less than probable cause. 480 U. S., at 327. That in no way affects our analysis, for even then it is clear that the Fourth Amendment applies. *Ibid.;* see also *United States* v. *Place,* 462 U. S. 696, 703 (1983).

[10] Of course, if the police officers' presence in the home itself entailed a violation of the Fourth Amendment, no amount of probable cause to believe that an item in plain view constitutes incriminating evidence will justify its seizure. *Horton,* 496 U. S., at 136–137.

noncriminal context. Indeed, it acknowledged what is evident from our precedents—that the Amendment's protection applies in the civil context as well. See *O'Connor* v. *Ortega*, 480 U. S. 709 (1987); *New Jersey* v. *T. L. O.*, 469 U. S. 325, 334–335 (1985); *Michigan* v. *Tyler*, 436 U. S. 499, 504–506 (1978); *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 312–313 (1978); *Camara* v. *Municipal Court of San Francisco*, 387 U. S. 523, 528 (1967).[11]

Nor did the Court of Appeals suggest that the Fourth Amendment applied exclusively to law enforcement activities. It observed, for example, that the Amendment's protection would be triggered "by a search or other entry into the home incident to an eviction or repossession," 942 F. 2d, at 1077.[12] Instead, the court sought to explain why the Fourth Amendment protects against seizures of property in the plain-view context, but not in this case, as follows:

"[S]eizures made in the course of investigations by police or other law enforcement officers are almost always, as in the plain view cases, the culmination of searches. The police search in order to seize, and it is the search

---

[11] It is true that *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856), cast some doubt on the applicability of the Amendment to noncriminal encounters such as this. *Id.*, at 285. But cases since that time have shed a different light, making clear that Fourth Amendment guarantees are triggered by governmental searches and seizures "without regard to the use to which [houses, papers, and effects] are applied." *Warden, Maryland Penitentiary* v. *Hayden*, 387 U. S. 294, 301 (1967). *Murray's Lessee*'s broad statement that the Fourth Amendment "has no reference to civil proceedings for the recovery of debt" arguably only meant that the warrant requirement did not apply, as was suggested in *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 352 (1977). Whatever its proper reading, we reaffirm today our basic understanding that the protection against unreasonable searches and seizures fully applies in the civil context.

[12] This was the view expressed by the Court of Appeals for the Tenth Circuit in *Specht* v. *Jensen*, 832 F. 2d 1516 (1987), remanded on unrelated grounds, 853 F. 2d 805 (1988) (en banc), with which the Seventh Circuit expressly agreed. 942 F. 2d, at 1076.

*and ensuing seizure* that the Fourth Amendment by its reference to 'searches and seizures' seeks to regulate. Seizure means one thing when it is the outcome of a search; it may mean something else when it stands apart from a search or any other investigative activity. The Fourth Amendment may still nominally apply, but, precisely because there is no invasion of privacy, the usual rules do not apply." *Id.*, at 1079 (emphasis in original).

We have difficulty with this passage. The court seemingly construes the Amendment to protect only against seizures that are the outcome of a search. But our cases are to the contrary and hold that seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place. See, *e. g., Jacobsen*, 466 U. S., at 120–125; *Place*, 462 U. S., at 706–707; *Cardwell*, 417 U. S., at 588–589.[18] More generally, an officer who happens to come across an individual's property in a public area could seize it only if Fourth Amendment standards are satisfied—for example, if the items are evidence of a crime or contraband. Cf. *Payton* v. *New York*,

---

[18] The officers in these cases were engaged in law enforcement and were looking for something that was found and seized. In this broad sense the seizures were the result of "searches," but not in the Fourth Amendment sense. That the Court of Appeals might have been suggesting that the plain-view cases are explainable because they almost always occur in the course of law enforcement activities receives some support from the penultimate sentence of the quoted passage, where the court states that the word "seizure" might lose its usual meaning "when it stands apart from a search *or any other investigative activity.*" *Id.*, at 1079 (emphasis added). And, in the following paragraph, it observes that "[o]utside of the law enforcement area the Fourth Amendment retains its force as a protection against searches, because they invade privacy. That is why we decline to confine the amendment to the law enforcement setting." *Id.*, at 1079–1080. Even if the court meant that seizures of property in the course of law enforcement activities, whether civil or criminal, implicate interests safeguarded by the Fourth Amendment, but that pure property interests are unprotected in the non-law-enforcement setting, we are not in accord, as indicated in the body of this opinion.

445 U. S., at 587. We are also puzzled by the last sentence of the excerpt, where the court announces that the "usual rules" of the Fourth Amendment are inapplicable if the seizure is not the result of a search or any other investigative activity "precisely because there is no invasion of privacy." For the plain-view cases clearly state that, notwithstanding the absence of any interference with privacy, seizures of effects that are not authorized by a warrant are reasonable only because there is probable cause to associate the property with criminal activity. The seizure of the weapons in *Horton*, for example, occurred in the midst of a search, yet we emphasized that it did not "involve any invasion of privacy." 496 U. S., at 133. In short, our statement that such seizures must satisfy the Fourth Amendment and will be deemed reasonable only if the item's incriminating character is "immediately apparent," *id.*, at 136–137, is at odds with the Court of Appeals' approach.

The Court of Appeals' effort is both interesting and creative, but at bottom it simply reasserts the earlier thesis that the Fourth Amendment protects privacy but not property. We remain unconvinced and see no justification for departing from our prior cases. In our view, the reason why an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question whether the Amendment applies. What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all. As we have observed on more than one occasion, it would be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara*, 387 U. S., at 530; see also *O'Connor*, 480 U. S., at 715; *T. L. O.*, 469 U. S., at 335.

The Court of Appeals also stated that even if, contrary to its previous rulings, "there is some element or tincture of a Fourth Amendment seizure, it cannot carry the day for the Soldals." 942 F. 2d, at 1080. Relying on our decision in *Graham* v. *Connor*, 490 U. S. 386 (1989), the court reasoned that it should look at the "dominant character of the conduct challenged in a section 1983 case [to] determine the constitutional standard under which it is evaluated." 942 F. 2d, at 1080. Believing that the Soldals' claim was more akin to a challenge against the deprivation of property without due process of law than against an unreasonable seizure, the court concluded that they should not be allowed to bring their suit under the guise of the Fourth Amendment.

But we see no basis for doling out constitutional protections in such fashion. Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's "dominant" character. Rather, we examine each constitutional provision in turn. See, *e. g.*, *Hudson* v. *Palmer*, 468 U. S. 517 (1984) (Fourth Amendment and Fourteenth Amendment Due Process Clause); *Ingraham* v. *Wright*, 430 U. S. 651 (1977) (Eighth Amendment and Fourteenth Amendment Due Process Clause). *Graham* is not to the contrary. Its holding was that claims of excessive use of force should be analyzed under the Fourth Amendment's reasonableness standard, rather than the Fourteenth Amendment's substantive due process test. We were guided by the fact that, in that case, both provisions targeted the same sort of governmental conduct and, as a result, we chose the more "explicit textual source of constitutional protection" over the "more generalized notion of 'substantive due process.'" 490 U. S., at 394–395. Surely, *Graham* does not bar resort in this case to the Fourth Amendment's specific protection for "houses, papers,

and effects" rather than the general protection of property in the Due Process Clause.

## III

Respondents are fearful, as was the Court of Appeals, that applying the Fourth Amendment in this context inevitably will carry it into territory unknown and unforeseen: routine repossessions, negligent actions of public employees that interfere with individuals' right to enjoy their homes, and the like, thereby federalizing areas of law traditionally the concern of the States. For several reasons, we think the risk is exaggerated. To begin, our decision will have no impact on activities such as repossessions or attachments if they involve entry into the home, intrusion on individuals' privacy, or interference with their liberty, because they would implicate the Fourth Amendment even on the Court of Appeals' own terms. This was true of the Tenth Circuit's decision in *Specht* with which, as we previously noted, the Court of Appeals expressed agreement.

More significantly, "reasonableness is still the ultimate standard" under the Fourth Amendment, *Camara, supra,* at 539, which means that numerous seizures of this type will survive constitutional scrutiny. As is true in other circumstances, the reasonableness determination will reflect a "careful balancing of governmental and private interests." *T. L. O., supra,* at 341. Assuming, for example, that the officers were acting pursuant to a court order, as in *Specht* v. *Jensen,* 832 F. 2d 1516 (CA10 1987), or *Fuentes* v. *Shevin,* 407 U. S. 67 (1972), and as often would be the case, a showing of unreasonableness on these facts would be a laborious task indeed. Cf. *Simms* v. *Slacum,* 3 Cranch 300, 301 (1806). Hence, while there is no guarantee against the filing of frivolous suits, had the ejection in this case properly awaited the state court's judgment it is quite unlikely that the federal court would have been bothered with a § 1983 action alleging a Fourth Amendment violation.

Moreover, we doubt that the police will often choose to further an enterprise knowing that it is contrary to the law, or proceed to seize property in the absence of objectively reasonable grounds for doing so. In short, our reaffirmance of Fourth Amendment principles today should not foment a wave of new litigation in the federal courts.

## IV

The complaint here alleges that respondents, acting under color of state law, dispossessed the Soldals of their trailer home by physically tearing it from its foundation and towing it to another lot. Taking these allegations as true, this was no "garden-variety" landlord-tenant or commercial dispute. The facts alleged suffice to constitute a "seizure" within the meaning of the Fourth Amendment, for they plainly implicate the interests protected by that provision. The judgment of the Court of Appeals is, accordingly, reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*