Eric R. BROWN; Laurie A. Brown; Adela D. Maxfield; Steven G. Maxfield, Plaintiffs–Appellants,

v.

MILLARD COUNTY; Leray Jackson, individually and in his official capacity as Millard County Attorney; Dexter Anderson, individually and in his official capacity as Deputy County Attorney; Edgar L. Phillips, individually and in his official capacity as County Sheriff; John Kimball, individually and in his official capacity as Deputy County Sheriff; Joe H. Penny, individually, Defendants–Appellees.

No. 01–4084.

United States Court of Appeals, Tenth Circuit.

Sept. 20, 2002.

James E. Morton, Bugden, Collins & Morton, Russell C. Skousen, Mackey, Price & Williams, Salt Lake City, UT, for Plaintiff–Appellant.

Robert R. Wallace, Plant, Wallace, Christensen & Kanell, Salt Lake City, UT, for Defendant–Appellee.

Before MURPHY, ANDERSON, and HARTZ, Circuit Judges.

## ORDER AND JUDGMENT*

MURPHY, Circuit Judge.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Plaintiffs-appellants appeal from the district court's order granting summary judgment in favor of defendants-appellees on plaintiffs' complaint brought pursuant to 42 U.S.C. § 1983. We affirm.

### FACTS

Many of the facts of this case are hotly disputed. Our review of the record, however, leads us to conclude that none of the factual disputes rises to the level of a genuine issue of material fact that would preclude the entry of summary judgment in favor of the defendants. *See* Fed. R.Civ.P. 56(c). As required, we have examined the factual record and reasonable inferences therefrom in the light most favorable to plaintiffs, the non-movants. *Wolf v. Prudential Ins. Co. of Am.,* 50 F.3d 793, 796 (10th Cir.1995).

In December 1996, Joe Penney and his wife Sandy entered into an oral agreement to sell a home located at 145 South Main, Kenosh, Utah (the "property"), to plaintiffs

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Eric and Laurie Brown.[1] This agreement was later memorialized in a short written contract, on or about February 1, 1997.

The Browns began living in the property in January 1997. The parties set a tentative closing date, which was to occur when the Penneys obtained a title insurance commitment. Once a commitment had been obtained, the Browns discovered three liens on the property against Joe Penney in favor of the Department of Human Services, Office of Recovery Services.

Joe Penney and the Browns agreed that $100 of the monthly payment on the property would be paid to the Office of Recovery Services until the liens were paid. They disagreed, however, whether the Browns would pay the $100 directly to the Office of Recovery Services, or whether they would pay the full payment amount to Penney and trust him to make the $100 payment. As a result of this dispute, the Browns did not make the monthly payments due under the contract. In July 1997, Joe Penney sued them in state court, seeking specific performance, damages, and return of the property.[2]

In early January 1998, while his suit was still pending in state court, Penney was advised by several people that the Browns had abandoned the property. He saw blinds missing from the home that caused him to conclude that this information was correct.[3] Penney became concerned about the condition of the home.

On January 12, 1998, Penney called defendant John Kimball, a Millard County deputy sheriff. Penny and Kimball had been friends since childhood. Penny asked Kimball whether he could enter the property and winterize it. He also asked Kimball whether he could take a car that was on the property along with other personal property on the premises to secure the money owed to him. Kimball told Penney he was going to talk to defendant Dexter Anderson, a Millard County deputy attorney, about another matter and that he would mention Penney's questions to Anderson and would get back to Penney.

Later that day, while Kimball was in Anderson's office, Penney again telephoned for Kimball. Kimball talked to Anderson about Penney's questions and relayed the answers to Penney on the telephone. Dexter told Kimball that a land-

---

1. The parties disagree concerning whether there was a binding contract in effect between the Penneys and the Browns in December 1996 or only upon the later execution of the February 1, 1997 written agreement. In Penney's suit against the Browns, the Fourth Judicial District Court, State of Utah determined that an oral contract existed in December 1996, memorialized by the later, February 1, 1997, written agreement. There is no discussion of statute of frauds issues in the state court decision.

2. This suit was not resolved until May 1998, when the state district court ruled that the Browns were entitled to specific performance of the contract, that they could pay $100 of the mortgage directly to the Office of Recovery Services, and that they must pay Penney and the Office of Recovery Services the sums past due under the contract.

The parties dispute whether the Browns had been holding funds in escrow in favor of Penney. The state district court found that an escrow existed. Defendants, who claim that the Browns simply failed to make payments, point to deposition testimony from Eric Brown that there was no actual money set aside on a monthly basis, but that Brown was owed money by Steven Maxfield that the Browns would have used to pay any balance adjudicated by the state court. This dispute does not involve a genuine issue of material fact that would preclude the entry of summary judgment.

3. In fact, Eric Brown was working in California, and Laurie Brown was attending school in Southern Utah. Laurie Brown came home and occupied the property on the weekends; Eric Brown occupied the home on weeks when he was not working.

lord[4] had the right to winterize the premises and to seize personal property but that he must be careful because he would be responsible for safekeeping and damage of the property.

Penney went to the property and "winterized" it. He turned off the water at the property and drained a fish tank[5] and waterbeds. He also seized numerous items of personal property and a 1988 Mercury Sable located at the premises. Plaintiffs allege that he damaged the property during the seizures. Some of the neighbors, observing this activity, called the police. Deputy Rick Carter initially was dispatched to the property, but he was called off after it was discovered that it was Penney who had entered the property.[6]

Approximately one week later, Laurie Brown's brother, plaintiff Steven Maxfield, noticed some items missing from the outside of the property. He called Laurie Brown, who told him that the items had been taken without her knowledge. Maxfield then called the police to report a theft. Deputy Carter took the call and told Maxfield that Dexter Anderson had said it was a civil matter and that he would not file a report. The Millard County Sheriff's office refused to arrest Penney even though Steven Maxfield and some of the other plaintiffs insisted that he be arrested.

Steven Maxfield and Laurie Brown later spoke with defendant Edgar L. Phillips, the Millard County Sheriff, who told them that if Dexter Anderson said it was a civil matter, his hands were tied. Sheriff Phillips did send a deputy to pick up paperwork concerning the property from plaintiffs, but Penney was never arrested or charged with burglary or robbery resulting from the incident.

On January 18, 1998, Adela Maxfield was driving with her children past the property when she noticed that Penney was in the yard. She stopped and got out of her vehicle. Penney swore at her and threatened her. When Adela Maxfield's father-in-law, Steven K. Maxfield,[7] learned of the incident, he telephoned the sheriff's dispatch. The dispatcher informed him that the sheriff's office had already received a call and that they had concluded that this was a civil matter not warranting the dispatch of an officer.

Sheriff Phillips also initially refused to dispatch an officer to the scene. Sometime later that day, however, he sent Deputy Quarnberg to the property. Brian Kershisnik, a friend of the Maxfields, also went to the property at Steven Maxfield's request. Penney threatened Kershisnik with violence if he stepped onto the property. Deputy Quarnberg told Kershisnik

4. Anderson claimed that he did not know the advice was being sought specifically for Penney. Plaintiffs dispute this. The factual dispute does not involve a genuine issue of material fact that would preclude the entry of summary judgment.

    Plaintiffs also argue that there are unresolved factual disputes concerning whether Penney told the defendants he was involved in a landlord-tenant situation and whether Kimball or Anderson told Penney they were operating on the assumption that a landlord-tenant situation was involved. Even if this is true, there is an abundance of uncontroverted evidence that Anderson's advice was given

based on his understanding that a rental, rather than a purchase, was involved.

5. There were no fish in the tank.

6. Factual disputes exist concerning whether Penney broke a window to enter the property, what items were taken from the house, which items were returned, and the condition of the items when they were returned. None of these disputes represents a genuine issue of material fact.

7. Steven K. Maxfield is the father of Steven G. Maxfield, a plaintiff in this action.

to leave. Plaintiffs allege that Deputy Quarnberg later pressured Adela Maxfield not to file a report concerning the incident.

Plaintiffs went to Anderson's office the following day and expressed their concern about Penney's latest actions. Anderson yelled at Steven Maxfield and told him he had no business being in his office.

On March 20, 1998, after a hearing on the civil action between Penney and the Browns, Penney threatened the Browns with a raised fist and told them they would never get the house because he would burn it first. On July 21, 1998, Steven Maxfield went to Delta, Utah, and attempted to meet with defendant LeRay Jackson, the county attorney. Jackson's secretary would not allow Maxfield to meet with Jackson; she also told him that Jackson would not second-guess Anderson. On November 9, 1998, Steven Maxfield called Anderson to let him know the outcome of the civil action; Anderson continued to refuse to assist Maxfield in getting plaintiffs' property back. Later that month, Penney returned some of the property, including the car.

Plaintiffs thereafter filed this civil rights complaint in federal district court. They alleged that the county officials had denied them due process and equal protection and had violated their Fourth Amendment rights. They brought supplemental state claims for conversion, replevin and trespass against Penney. The district court concluded that the level of involvement by the county officials had been insufficient to

result in liability under § 1983, and that the county officials were shielded by either absolute prosecutorial immunity or qualified immunity in any event. It also dismissed the claims against Penney, apparently declining to exercise supplemental jurisdiction over them.

## ANALYSIS

"We review a district court's grant of summary judgment de novo, applying the same legal standard used by the district court." *Hollins v. Delta Airlines*, 238 F.3d 1255, 1257 (10th Cir.2001). Summary judgment is proper if the moving party shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir.2000) (quotation omitted).

### 1. Standing

■ We begin by addressing a threshold issue concerning standing. Defendants contend that plaintiff Adela Maxfield lacks standing to bring this complaint because neither the property nor any of the items of personal property allegedly stolen by Penney belonged to her. Aplt.App. at 56.

The record contains no evidence that Adela Maxfield had any property interest in the property involved in this case.[8] She

---

8. As proof of Adela Maxfield's lack of standing, defendants' motion for summary judgment cites her responses to interrogatories, attached to the motion as Exhibit "M." The Exhibit "M" provided with appellants' appendix, however, consists solely of a certificate of service. Aplt.App. at 192–93. It is unclear whether Exhibit "M" as originally filed with the district court included the responses themselves. This court made two requests to

appellants' counsel to supplement the record with the actual responses to interrogatories, rather than just the certificate of service that appears in their appendix. In response to the first request, appellants' counsel sent another copy of the certificate of service, which already appears in the appendix. This was not helpful to the court. In response to the second inquiry, appellant sent a copy of Exhibit "N," Steven G. Maxfield's answers to inter-

fails to show she has standing to complain about Joe Penney's actions concerning the property. She does, however, have standing to complain about the defendants' alleged failure to protect her from Joe Penney, and may proceed on that basis.

### 2. State action

■ Plaintiffs assert that the county defendants may be held responsible under § 1983 for Joe Penney's conduct. Penney is not named as a defendant in any of their § 1983 claims. We are therefore not faced with the typical dilemma faced in a "state action" case: whether Penney's conduct received sufficient imprimatur by the state to make *him* liable under § 1983 as a "state actor." *See Blum v. Yaretsky*, 457 U.S. 991, 1003, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Rather, the "state action" issue raised here turns on whether the county defendants can be held responsible for Penney's conduct. *See id.* at 1004.

"[A] State normally can be held responsible for a private decision [or conduct]

only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.; see also generally Gallagher v. "Neil Young Freedom Concert"*, 49 F.3d 1442, 1447 (10th Cir.1995) (setting out four tests traditionally used to determine whether action taken by private parties is "state action").

In attempting to show that the county defendants should be held responsible here, plaintiffs rely on a "joint participation" theory. They assert that "Penney . . . would not have taken the action he did but for the advice and cooperation of the County officials" and that "the actions of the County Officials [led Penney] to claim he had a right to do what he did." Aplt. Opening Br. at 21.[9] We conclude, however, that the county defendants' actions represent at most "[m]ere approval of or acquiescence in the initiatives of a private party" and therefore represent insufficient state action to sustain a cause of action

---

rogatories, which not only already appears in their appendix, but was not even the right exhibit. Appellant never sent Adela Maxfield's actual responses to the interrogatories, in spite of two requests to do so. Exhibit "M" therefore remains incomplete.

There are other indications in the record, however, that Adela Maxfield did not assert any right to the affected property in her answers to interrogatories. In plaintiffs' response to defendants' statement of undisputed facts, plaintiffs stated "[a]s to Movants' Exhibit M, Plaintiffs seek to *amend it* to reflect marital property rights" in the Sable automobile in which her husband claimed an interest. *Id.* at 217 (emphasis added). This suggests that Adela Maxfield either affirmative disclaimed, or at least made no claim to the Sable in her original response to interrogatories. There is no indication in the record, moreover, that Adela Maxfield actually followed through on this belated assertion of marital rights by supplementing or amending her answers under oath at any time. Her later affidavit deals with different factual matters. *See id.* at 285–87. Under these circum-

stances, and given the state of the record, we must conclude that there is no evidence to support Adela Maxfield's claim to an ownership interest in the Sable.

Moreover, even if we were to conclude that Adela Maxfield had standing, summary judgment would still be appropriate, for reasons stated later in this order and judgment.

9. This formulation somewhat overstates the deposition testimony. According to Penney, defendants did not give him "permission" to remove the property; he gave *himself* such permission; and merely informed them of what he was going to do and asked them not to report it stolen. Aplt.App. at 258 (depo. p. 64). Admittedly, Penney "doubted" he would have removed the property if he had been told it would be a crime and that he would be arrested. *Id.* at 259 (depo. p. 85). John Kimball did not tell Penney to take the property, however; he merely said that Penney should be careful not to damage the property if he did take it. *Id.* (depo. pp. 86–87).

under § 1983. *Blum,* 457 U.S. at 1004–05. We reach this conclusion for several reasons.

■ First, a governmental official may not be held liable under § 1983 merely for announcing circumstances under which he will not interfere with a private disposition of property. *See, e.g., Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 164–66, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Rather, the state must have *compelled* the unlawful seizure. *See id.* at 164. This is true even if, as plaintiffs assert, Penney would not have acted absent the advice he received. *See United States v. Coleman,* 628 F.2d 961, 964 (6th Cir.1980) (citing *Flagg,* determining that private seizure was not state action subject to Fourth Amendment strictures).

■ Second, plaintiffs fail to demonstrate the existence of joint participation between the county defendants and Penney resulting in the violation of plaintiffs' civil rights. Plaintiffs cite no cases in which joint participation has been predicated simply on an agreement by governmental authorities not to interfere with a private seizure, or by the giving of advice about a private seizure.

Joint participation typically arises when the authorities agree to facilitate unconstitutional acts by a private party through affirmative action, such as agreeing to arrest persons designated by a shopkeeper. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).[10] *Soldal v. Cook County,* 506 U.S. 56, 60 n. 4, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), cited by plaintiffs, probably represents the bare minimum involvement on which a claim of joint participation can be predicated; in that case, police accompanied the private party while he committed the unlawful seizure, to ensure that the victim did not interfere. *Soldal,* 506 U.S. at 58. In *Soldal,* the Supreme Court declined to review a holding by the Seventh Circuit that there was sufficient evidence of joint participation by conspiracy to survive summary judgment, noting that "the police prevented Soldal from using reasonable force to protect his home from private action that the officers knew was illegal." *Id.* at 60 n. 6. No such action by a governmental actor has been demonstrated in this case.[11]

### 3. Failure to protect

■ Plaintiffs' claims also fail under a "failure to protect" theory. Absent circumstances suggesting a violation of the Equal Protection Clause (which we address later in this decision), "nothing in the language of the Due Process Clause itself requires the State to protect the life, liber-

---

**10.** Joint participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiffs must show that the public and private actors shared a common, unconstitutional goal. *Sigmon v. CommunityCare HMO, Inc.,* 234 F.3d 1121, 1126 (10th Cir.2000). Also, as *Soldal* indicates, even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions. *Soldal,* 506 U.S. at 60, n. 6.

**11.** The other cases cited by plaintiffs are equally distinguishable. In each case, there was a good deal more state involvement than we have here. *See Specht v. Jensen,* 832 F.2d

1516 (10th Cir.1987) (policeman accompanied private party to victim's home and threatened victim of private repossession attempt with arrest), *judgment vacated in part on other grounds on en banc reh'g,* 853 F.2d 805 (10th Cir.1988); *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423 (10th Cir.1984) (police officers assisted off-duty police officer in subduing and arresting suspect), *reaff'd,* 796 F.2d 1307 (1986); *Coleman v. Turpen,* 697 F.2d 1341 (10th Cir.1982) (sheriff's department hired private wrecking service to tow and store camper that was subsequently sold for storage charges).

ty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *see also Seamons v. Snow,* 84 F.3d 1226, 1235–36 (10th Cir. 1996) (rejecting § 1983 claim, based on lack of state action, where school failed to protect student from taunting and hostility by fellow students). A limited exception to this principle has been recognized where the state through affirmative conduct places an individual in a position of danger. *See, e.g., Jones v. Union County,* 296 F.3d 417, 428 (6th Cir.2002). Even if we assume that defendants' advice to Penney placed plaintiffs in danger, however, a "failure to protect" claim implicates substantive due process and therefore requires the plaintiff to show that the failure to afford protection "shocks the conscience" of federal judges. *Ruiz v. McDonnell,* 299 F.3d 1173, 1183–85 (10th Cir.2002). As a matter of law, the facts of this case do not contain the kind of "exceptional circumstances" that shock the judicial conscience. *See id.* (discussing "exceptional circumstances" test).

In sum, plaintiffs have failed to demonstrate that the county officials violated their right to due process or their Fourth Amendment rights. Because we resolve the due process and Fourth Amendment claims on this basis, we need not consider whether absolute or qualified immunity apply to defendants' actions.

### 4. Equal protection claim

■ Plaintiffs also alleged that the county defendants' actions denied them the equal protection of the laws. They claimed that they were treated less favorably by the county defendants than was Penney.

Plaintiffs' claim of being treated "less favorably" than Penney does not establish an equal protection violation. To establish an equal protection violation under § 1983, plaintiffs must show that they are members of a protected class and that defendants purposefully discriminated against them because of their membership in that class. *Jones,* 296 F.3d at 426. Plaintiffs have cited no authorities to show that newcomers to a community should be considered members of a protected class, or that Penney's friendship with various state officials somehow makes plaintiffs members of a protected class. Their equal protection claim therefore also fails.

### 5. Supplemental state claims

The district court evidently declined to exercise supplemental jurisdiction over the state law claims against Penney, though it noted that those claims might have merit. Plaintiffs do not challenge the district court's decision to decline supplemental jurisdiction and we find it unnecessary to discuss this issue further.

The judgment of the United States District Court for the District of Utah is AFFIRMED.

HARTZ, Circuit Judge, concurring.

I concur in the result and join all of Judge Murphy's opinion except the discussion of the equal-protection claim.

I do not agree that plaintiffs claiming a denial of equal protection "must show that they are members of a protected class and that defendants purposefully discriminated against them because of their membership in that class." Op. at 890. *In Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), the Supreme Court wrote, "Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others

similarly situated and that there is no rational basis for the difference in treatment." Thus, plaintiffs here could prevail without showing that newcomers to a community are a "protected class."

Nevertheless, the denial of the equal-protection claim should be affirmed. Plaintiffs waived the issue on appeal. The treatment of the issue in their briefs is perfunctory, with not one citation of authority. In addition, they have failed to refer to any evidence regarding how other "similarly situated" people were treated by the defendants. Defendant Penny was not similarly situated; if anything, his situation was the opposite of plaintiffs'.