NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0483n.06

Nos. 08-4225/4226

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 06, 2010**
LEONARD GREEN, Clerk

JEANETTE SPANGLER, ET AL.,            )
                                      )
     Plaintiffs-Appellees,            )
                                      )   ON APPEAL FROM THE
v.                                    )   UNITED STATES DISTRICT
                                      )   COURT FOR THE SOUTHERN
DWAYNE WENNINGER, ET AL.,             )   DISTRICT OF OHIO
                                      )
     Defendants-Appellants.           )

Before:     KEITH, COLE, and GIBBONS, Circuit Judges.

**KEITH, Circuit Judge.** Defendants-Appellants Dwayne Wenninger ("Wenninger") and Albert J. Rodenberg, Jr., ("Rodenberg") (collectively "Defendants") appeal the district court's denial of their motions for summary judgment. They argue that they are entitled to immunity from Plaintiffs-Appellees' federal and state law claims against them as a matter of law. Plaintiffs-Appellees Jeanette Spangler ("Spangler") and Jerrod Messer ("Messer") (collectively "Plaintiffs") sued Defendants pursuant to 42 U.S.C. § 1983 for violating their Fourth Amendment rights. During the course of a search of Plaintiffs' real property, Plaintiffs' personal property was damaged at Defendants' authorization. For the reasons discussed below, we **AFFIRM** the district court's denial of Defendants' motions for summary judgment.

No. 08-4226
*Jeanette Spangler, et al. v. Dwayne Wenninger, et al.*

## I. BACKGROUND

**A.      Facts**

In 1997, Vincent Doan ("Doan") was convicted of the kidnapping and aggravated murder of Carrie Culberson.  The Clinton County Sheriff's Office conducted the investigation and arrested Doan.  Culberson's body was never found.  In early 2004, deputies of Ohio's Clermont County Sheriff's Office received tips from reliable informants concerning the whereabouts of Culberson's body.  The informants told the deputies that Culberson's body could be found near or under the garage on Spangler's real property at 21962 Fayetteville-Blanchester, which is located in Brown County, Ohio.  Spangler's son, Messer, lived in and operated a business on the property until his imprisonment for unrelated charges in 2003.  Messer stored supplies, tools, and equipment for his roofing and construction business in the garage.  He also stored vehicles there.  At the time of the search, Spangler did not live on the property and had rented the property to tenants.

On April 27, 2004, Clermont County Deputy Mark Penn ("Penn") met with officers from the Sheriff's Office in Brown County, including Captain Barry Creighton ("Creighton"), Chief Deputy John Dunn, and Sergeant John Schadle.  After Penn informed them of the facts of the investigation, they assisted him in preparing a search warrant.  Penn and Creighton subsequently obtained a search warrant from Brown County Judge Thomas Zachman.  The search warrant stated, in relevant part:

> WHEREAS there has been filed with me an Affidavit, copy of which is attached hereto and incorporated herein, in the County aforesaid, and they are hereby commanded to go to the afore described premises . . . and there diligently search for a body, body parts, or any human remains, including but not limited to blood, hair, skin, bones, or any clothing or other articles relevant to a site where a body has been disposed of.

2

(R. 72-2, Search Warrant at 1.)   After obtaining the search warrant, Penn requested the FBI's assistance in executing the search warrant.  The FBI agreed to provide assistance, and FBI Special Agent Stephen Griegher ("Griegher") was present at the property nearly every day of the search.

The search began on April 27, 2004.  Brown County Sheriff Wenninger was generally in charge of the search, but Brown County Deputy John Dunn ("Dunn") was in charge of the search when Wenninger was not present.  Wenninger was on site on six separate occasions and assisted with digging and operated a Bobcat during his multiple visits to the site.  When neither Dunn nor Wenninger were on the property,  Clermont County Sheriff Rodenberg was in charge of the search, and in his absence, Penn was in charge.

The search began with the drilling of holes in the concrete floor of the garage.  Cadaver dogs were brought to the search site after the holes were drilled to assist in the search for the missing body.  Officers would dig in those areas where the dogs indicated the possible presence of a cadaver.  On April 29, 2004, Dunn and others removed some of the personal property contained in the garage.  Dunn contacted a tow truck service to move some of the vehicles in the garage to the front of the property.  By May 1, 2004, law enforcement officers had removed the remaining personal property from the garage.

After extracting the dirt from the ground, the officers would examine it for human remains.  The dirt would then be moved outside of the garage.  By May 3, 2004, there was large hole in the garage from the digging, and the hole became filled with water after a heavy rain.  As the search progressed, Defendants became concerned about the structural integrity of the garage, and Wenninger reinforced the frame of the garage, applying his construction knowledge.

Defendants soon ran out of space to store the extracted and examined dirt. Defendants then began piling dirt on top of Plaintiffs' personal property, including the vehicles, outside of the garage. Dunn and Wenninger testified that they considered the property left outside the garage to be "junk." (R. 77, Dunn Dep. at 211-12; R. 78, Wenninger Dep. at 95.) Dunn testified that the officers knew that they were damaging the property by piling dirt on it. Plaintiffs argue that an aerial photograph shows that there was ample room on the two-acre property to move either the personal property or the extracted dirt to another area to avoid ruining their property. Despite this, other areas of the property and neighboring properties were not used to place the extracted dirt. Dunn testified that nothing prohibited Penn from returning to Judge Zachman to request an expansion of the search warrant to allow for this to happen.

On May 10, 2004, Dunn and Wenninger decided to end the search because the cadaver dogs no longer picked up any scents. The search ended on May 11, 2004. The law enforcement officers did not fill the hole that they dug in the garage, which was as deep as fifteen feet. Wenninger admitted that he knew that the hole in the garage would likely fill with rain water and groundwater, but he advised the law enforcement personnel that they were not required to fill it. The hole did indeed fill with water, creating a pond in Plaintiffs' garage. The tenants renting the house on the property moved out of the property near the end of the search because the septic system was damaged.

**B.      Procedural History**

On April 20, 2006, Plaintiffs filed a multi-count complaint against the Brown County Board of Commissioners ("Brown Board"), Brown County Sheriff Wenninger, the Clermont County Board

of County Commissioners ("Clermont Board"), and Clermont County Sheriff Rodenberg, alleging violations of their civil rights and seeking recovery for property damage arising from the execution of the search warrant. At the close of discovery, all of the defendants moved for summary judgment on Plaintiffs' claims on January 6, 2008. Defendants asserted immunity defenses for the claims being brought against them in their individual capacities. The district court granted summary judgment in favor of the Clermont Board, the Brown Board, and Wenninger and Rodenberg in their respective official capacities and on the failure to discipline claim. The district court denied the motion for summary judgment on the claims brought against Rodenberg and Wenninger in their individual capacities, finding that "there is a genuine issue of material fact as to the reasonableness of the destruction of Plaintiffs' property." (R. 131, 9/03/2008 Order at 12.)

## II. ANALYSIS

This Court reviews a district court's grant of summary judgment *de novo. See Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006) (citing *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006)). Summary judgment is only appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *See Jones v. Potter*, 488 F.3d 397, 402-03 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

5

## A.      Qualified Immunity for Fourth Amendment Claims

Plaintiffs brought a 42 U.S.C. § 1983 lawsuit, alleging that Defendants had violated their Fourth Amendment right to be free from unreasonable searches and seizures. Section 1983 prohibits violations of citizens' constitutional rights by state officials. *See* 42 U.S.C. § 1983. Defendants argue that they are entitled to qualified immunity on this claim, which has been brought against them in their individual capacities. Qualified immunity shields government officials performing discretionary functions from "'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Feathers v. Aey*, 319 F.3d 843, 847 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity does not serve merely as a defense against liability to be asserted during litigation. *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). Rather, it offers "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *See Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) (citing *Saucier*, 533 U.S. at 201). A right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Thus, the relevant inquiry is "whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

The first question is whether Plaintiffs' constitutional rights were violated. The Fourth Amendment secures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." by federal government officials. U.S. Const. amend. IV. The Fourteenth Amendment extends this constitutional guarantee to searches and seizures by state officers. *See Elkins v. United States*, 364 U.S. 206, 213 (1960).

Plaintiffs' claims are premised on Defendants' seizure of their personal property and garage, which affected their possessory interests in said property. A seizure occurs where "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). The destruction of property is a "meaningful interference" with personal property and constitutes a seizure within the meaning of the Fourth Amendment. *Jacobsen*, 466 U.S. at 124-25. The manner in which the seizure is conducted is reviewed for "reasonableness, and in a § 1983 action the District Court must determine not whether the destruction was 'reasonably necessary to effectively execute the search warrant' but whether the plaintiff has raised factual issues to be submitted to a jury on this point." *Hill v. McIntyre*, 884 F.2d 271, 278 (6th Cir. 1989) (quoting *Tarpley v. Greene*, 684 F.2d 1, 9 (D.C. Cir. 1982)).

Photographs of the property following the search show that the property was left in complete disarray with piles of dirt placed all over Plaintiffs' vehicles and property. While Defendants claim that they had no choice but to pile dirt on Plaintiffs' personal property, there was evidence that there

7

were other areas of the property where the dirt or personal property could have been placed. Defendants could have sought to expand the search warrant to allow for the placement of the extracted dirt in these other areas, but they did not. They have failed to identify any exigent circumstances that explain their failure to do so although Plaintiffs' two-acre property could have easily accommodated this. Wenninger was at the site on several occasions, operating a Bobcat and piling dirt on Plaintiffs' property. The officers were aware that doing this would damage Plaintiffs' property. Additionally, Defendants failed to fill the hole that they dug during the search, leaving a hole that was up to fifteen feet deep in the garage that became filled with water. Defendants fail to explain why they did not fill the hole, and merely argue that they believed that they were not required to do so. However, Wenninger testified that the officers were aware that the hole could become filled with water upon conclusion of the search. The totality of the circumstances did not warrant the knowing destruction of Plaintiffs' personal property by unnecessarily piling dirt on it, and failing to fill the large hole that remained in the garage. Viewing the evidence in the light most favorable to the nonmoving parties in this case, Plaintiffs, we find that genuine issues of material fact remain concerning the reasonableness of Defendants' conduct here.

We next consider whether the constitutional right against the unreasonable destruction of personal property was clearly established. "In inquiring whether a constitutional right is clearly established, [a district court] must look first to the decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within the circuit, and finally to decisions of other circuits." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004). The Supreme Court established that the unreasonable destruction of property may be a meaningful interference with

personal property constituting an unconstitutional seizure under the Fourth Amendment in 1984.

*See Jacobsen*, 466 U.S. at 113 (1984); *see also Soldal*, 506 U.S. at 61 (1992); *Thomas v. Cohen*, 304

F.3d 563, 571 (6th Cir. 2002). Accordingly, this constitutional right was clearly established.

Nonetheless, liability under § 1983 cannot be based on the doctrine of *respondeat superior*.

*See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citing *Hays v. Jefferson County*, 668 F.2d

869, 874 (6th Cir. 1982)). For supervisory liability to attach, the officers must have done "more than

play a passive role in the alleged violation or showed mere tacit approval of the goings on." *Bass*

*v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). "At a minimum a plaintiff must show that the

[supervising] official at least implicitly authorized, approved, or knowingly acquiesced in the

unconstitutional conduct of the offending officers." *Shehee*, 199 F.3d at 300. As the district court

noted:

> Plaintiffs have shown that Sheriff Wenninger directly participated in the search.
> Sheriff Wenninger was on site on six separate occasions and helped with the actual
> digging. Plaintiffs have also shown that Sheriff Rodenberg at least implicitly
> authorized the manner in which the search was conduct[ed]. Sheriff Rodenberg
> testified that he has a 'general' awareness of the search, and that on May 5, 2004 he
> spent about ninety minutes at the site to survey the progress.

(R. 131, 9/30/2008 Order at 11-12.) Accordingly, there are genuine issues of material fact

concerning Defendants' supervisory liability.

**B.      Immunity under Ohio Law for State Law Claims**

Defendants next argue that the district court erred by finding that they were not entitled to

immunity for the state law claims against them. The Political Subdivision Tort Liability Act, as

codified in Ohio Revised Code Chapter 2744, requires a three-tiered analysis to determine whether

immunity is applicable. *See Carter v. City of Cleveland*, 697 N.E.2d 610, 614 (Ohio 1998). Section 2744.02(A)(1) sets out a general rule that political actors are not liable for damages. *See id.*; OHIO REV. CODE ANN. § 2744.01 (B)(1). The second tier of the analysis is whether one of the exceptions in section 2744.02(B) apply. OHIO REV. CODE ANN. § 2744.02 (B). The third tier of the analysis is a consideration of the application of Ohio Revised Code § 2744.03. Here, the parties agree on the first tier of the analysis and disagree concerning the applicability of an exception to the general bar on liability.

Plaintiffs argue that Defendants are not entitled to immunity because section 2744.03(A)(6), an exception to immunity, applies to their claims against Defendants. In relevant part, section 2744.03(A)(6) provides: "the employee is immune from liability unless one of the following applies: . . . (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." OHIO REV. CODE ANN. § 2744.03 (A)(6). As the district court noted, "Sheriff Wenninger intentionally piled dirt on Plaintiffs' personal property and drove the 'Bobcat' excavator over the piles of dirt. . . . Sheriff Rodenberg spent about ninety minutes surveying the site [and whether he] was reckless by failing to prevent the dirt from being piled on the property is [] a question for the jury." (R. 131, 9/30/2008 Order at 24.) Given Defendants' conduct, there is a question for the jury regarding the applicability of section 2744.03(A)(6). Moreover, this issue is generally left for the jury. *See Fabrey v. McDonald Vill. Police Dept.*, 639 N.E. 2d 31, 35 (Ohio 1994) ("[The] issue of wanton misconduct is normally a jury question.").

### III.  CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's determination that Defendants are not entitled to immunity as a matter of law on Plaintiffs' federal or state law claims against them.